Mr. Justice MILLER,
stating the facts of the case, as he proceeded, and showing that its different parts were proved by the testimony, delivered the opinion of the court to the following effect:
We think that, in point of fact, the allegation of the an *79 swer, — that tbe traffic in which this firm engaged was the buying up of soldiers’ claims, before any scrip or land warrants were issued, and not the purchase and sale of bounty land warrants and Scrip, — is true. We have as little doubt that the traffic was illegal. Undoubtedly, the main object of the ninth section of the act of February 11, 184-7, was to protect the soldier against improvident contracts of the precise character qf those developed in this record. It was a wise and humane policy, and no court could hesitate to enforce it, in a case which called for its application. If a soldier, who had thus sold his claim to Brooks, Field & Co., had refused to perform his contract, or to do any act which was necessary to give them the full benefit of their purchase, no court would have compelled him to do it, or given them any relief against him. And if they had, by any such means, got- possession of the land warrant or scrip of a soldier, no court would have refused, ib a proper suit, to compel them to deliver up such land warrant, or scrip to the soldier. Or if Brooks, after the signing of these articles of partnership, had said to Martin, “ I refuse to proceed with this partnership, because the purpose of it is illegal,” Martin would have beementirely without'remedy. • If, on the other hand, he had said to Martin, “I have bought one hundred soldiers’ claims, for which I have agreed to pay a certain sum, which I require you to advance according to your agreement,” Martin might have refused to comply with such a demand, and no court would have given either of his partners any remedy for such a refusal. To this extent go the cases of Russell v. Wheeler,* Sheffner v. Gordon,† Belding v. Pitkin,‡ and the others cited by counsel for appellant, and-no further.
All' the cases here supposed, however, differ materially from the one now before us. When the bill in the. present case was filed, all the claims of soldiers thus illegally purchased by the partnership, with money advanced by complainant, had been converted into land warrants,.and all' the warrants had been sold or located. The original defect in *80 the purchase had, in many cases, been cured by the assignment of the warrant by the soldier after its issue. A large proportion of the lands so located had also been sold, and ■ the money paid for some of it, and notes and mortgages given for the remainder. There were then in the hands of defendant, lands, money, notes, and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced. It is to have an account of these funds, and a division of these procéeds, that this bill is filed. Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier ? It is difficult to perceive how the statute, enacted for the benefit of the soldier, is to be rendered any mere effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so ? The title to the lands is not rendered void by the statute. It interposes no obstacle to the collection of the notes and mortgages. The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case.
In Sharp v. Taylor * a case in the English Chancery,.the plaintiff and defendant were partners.in a vessel, which, being American built, could not be registered in Great Britain, according to the navigation • laws of that kingdom. Nor could the owners, who were British subjects, residing in England, have her registered in the United States. They undertook to violate .the laws of both countries by having her falsely registered in Charleston, South Carolina, as owned by a citizen and resident of that place. In this condition, she made several trips, which were profitable; and the defendant, colluding with Robertson, the American agent in whose name the vessel had been registered, refused to account with plaintiff for his share of the profits, or to *81 acknowledge his interest in the ship. When plaintiff brought his suit in Chancery in England, the defendant set up the illegality of the traffic, and the violation of the navigation laws of both governments, as precluding the court from granting any relief, on the same principle that is contended for by the defendant in the present case. It will be at once perceived that the principle is the same in both cases, and that the analogy íd the facts is so close that any rule on the subject which should govern the One ought also to control the other. The ease wasjlecided by Lord Chancellor Cot-tenham and from his opinion we make the* following extracts The answer'to the objection appears to me to be this, — that the plaintiff does not ask to enforce any agreement adverse to the provisions of the act- of Parliament. He is not seeking compensation and payment for an illegal voyage. That matter was disposed of when Taylor” (the defendant) “ received the money; and plaintiff is now only seeking payment for his share of the realized profits. . . . . As between these two, can this supposed evasion of the law be set up as a defence by one .against the otherwise clear title of the other ? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision or some act of Parliament has been violáted or neglected ? . . . . The answer to this, as to the former.case, will be, that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to-do between the parties.The difference between enforcing illegal contracts, and asserting title to money which has arisen from them, is distinctly taken in Tenant v. Elliot,* and Farmer v. Russell,† and recognized and approved by Sir William Grant, in Thomson v. Thomson."‡
These cases are all reviewed in the opinion of this court -in the case- of McBlair v. Gibbes,§ and the language here-quoted from the principal case is there referred to with approbation. We ■ are quite satisfied that the doctrine thus *82 announced is sound, and that it is directly applicable to the case before us.
The plaintiff alleges in his bill, that on the 28th day of June, 1848, he sold his interest in the partnership business to the defendant Brooks; that in making the sale he was overreached by the' fraud of Brooks, who; by concealment of what he knew, and false representations in what he professed to toll, took advantage of the embarrassed financia,] condition of plaintiff, and his ignorance of the partnership business, and procured from him the sale for a consideration totally disproportioned to the real value of his interest in the' concern. The defendant admits the purchase of plaintiff's interest, buf denies the fraud, and insists, that the transaction was in all respects fair and honest. The' issue thus generally stated here, is the one mainly contested in the case; and so contested that a record of m thousand printed pages is mostly filled with testimony on this'subj'ect.
If the parties are to be regarded in this transaction as holding towards each other, no different relations from those which ordinarily attend buyer and seller; and as, therefore, under no special obligation to deal conscientiously with each other, wo are satisfied that no such fraud is proven as would justify a court in setting aside an' executed contract. But there are relations of trust and confidence which one man may occupy towards another, either personally, or in regard to the particular property which is the subject of the contract, which impose upon him a special and peculiar obligation to deal with the other person towards whom he stands so related, with a candor, a fairness, and a refusal to avail himself of any advantage of superior information, or other favorable circumstance, not required by courts of justice in the usual business transactions of life. It .is contended that the relation of Brooks towards Martin was of this character; and before we can dispose of the question of fraud, it is necessary to determine whether the claim thus set up is well-founded ; and if it is, what are the principles upon which •courts of equity determine the validity of contracts betwéen - parties so situated. It'is argued that_the partnership, exist *83 ing between the parties constitutes of itself a relation which calls for the application of the principles which we have alluded to; and Judge Story, in recapitulating■ the confidential relations to which they are appropriate,* mentions partner and partner as one of them. It- is not necessary to decide here whether, in all cases, a. sale by one partner to another of his interest in the partnership concern, will be scrutinized with the same' closeness which is applied to fiduciary relations generally; for there are special circumstances in this case which bring it clearly within the rujies applicable to that class of cases.
1. The defendant was not only the partner'of p tiff, but he was his special agent in the management of the -business. The bill alleges that he had a power of attorney from plaintiff, authorizing him to represent, on all occasions, the interest of plaintiff in the conduct of the affairs of the firm; and although this is denied in the, answer, and is not proven, the answer does state that at the time-the partnership was formed, it was distinctly agreed between plaintiff and defendant that' the latter was to have the full and.exclusive control of the business, and should so far represent the plaintiff as to give defendant a preponderating influence in the management of the partnership over Mr. Field, the third partner. The record leaves no doubt that he acted throughout in aceordance with this agreement.
2. It is abundantly established by the testimony that,,. within some two or three months after the partnership was -formed, the parties closed their operations in New Orleans, after having invested over $50,000,'advanced by'Martin, in the purchase of soldiers’ claims; and that thenceforth very little was done in the wmy of purchasing claims or warrants. That Brooks then came to "Washington to procure the warrants to be issued, and Field went to Wisconsin to seek a market for their sale. From that time forward, Brooks and Field had the entire management of the business, mainly under the direction of Brooks; and none of it was conducted *84 in New Orleans save tbe purchase of five or six warrants made by Brooks on Martin’s suggestion, nor were any reports made of tbe business to Martin
Brooks and Field thus managed tbe entire concern, at a distancé of near two thousand miles from Martin) and, as we think the testimony shows, without consulting him in anyway, and with very little regard for his large interest in the business.
Under these circumstances, Brooks must be held te .have been not only the partner, but the special agent of Martin; and the purchase made by him of Martin’s interest must be tested by the rules which govern such transactions as between- principal and agent.
What are these rules ? “ Oh the whole, the doctrine may be generally stated, that wherever confidence is reposed, and one party has it in his power, in a secret manner, for his own advantage, to sacrifice those interests which he is bound to protect, he will not be- permitted to hold any such advantage.”* Or, to speak -more specifically, í£if a partner who exclusively superintends the business and accounts of the concern, by concealment of the true state of the accounts and business, purchase the share of the other partner for an inadequate price, by means of such concealment, the -per-chase will' be held void.”†
Speaking of a purchase by a trustee from his cestui que trust, Lord Chancellor Eldon says, in the case of Coles v. Trecothick,‡ that though permitted, it is a transaction of great delicacy, and which the court will watch with the utmost diligence; so much, that it is very hazardous for a trustee fo engage in such a.transaction. “A trustee may' buy from the cestui, que trust, provided there is a distinct and clear contract, ascertained to be such after a jealous ana .scrupulous examination of all the circumstances; provided the cestui que trust intended the' trustee should buy; and there is no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character *85 of trustee: I admit,” he says, “ it is a difficult case to make out, wherever it is contended that the exception prevails.” This has long been regarded as a leading case, and the above remarks have been often cited by other courts with approbation. "We think them fully applicable to a purchase, by an agent from his principal, of the property committed to his agency.*
We lay down, then, as applicable to the case before us, and to all others of like character, that in order to sustain such a sale, it must he made to appear, first, that the price paid approximates reasonably near to a fair and adequate consideration for the thing purchased; and, second, that all the information in possession of the purchaser, which was necessary to enable the seller’to form a sound judgment of the value of what he sold, should have been communicated by the former to the latter.
In regard to the adequacy of the price, .it is obvious that Brooks did not pay to Martin anything which he was not bound to pay before the sale was made, or assume any obligation under which he did not already rest; nor- did Martin i’eceive anything which Brooks did not then.owe him, or his promise to do anything for which Brooks was not previously bound. The only matter in which their relations were changed was, that Martin, sold to Brooks his share of the profits of the business, and Brooks assumed to bear all Martin’s share of the'losses.
So. the condition of the partnership business, at. this time, shows a balance of $15,000† of profits, all of which was cash, or funds equal to cash. It further appears, that there were on hand and unsold over 45',000 acres of land, which; ai „iie Government rate of $1.25 an acre, gives an aggregate value of $57,000, Add this to the $15,000 above mentioned, and wé have $72,000 as the probable profits of the partnei\ship venture, at the time . of this sale.
*86 It is said tbat the danger that soldiers would seek to reclaim the warrants, or the lands on which they had been located, under the provisions of the act of 1847, already' mentioned, must have detracted 'largely from the amount which any prudent man would have given for Martin’s interest in the concern. This danger was, however, a very remote and improbable one,'and must have so appeared, when we consider that these claims have been bought from young men scattered over the different States of the Union; with no means of ascertaining where the warrants wfere located, or in whom the title was vested; and that the amount, in each case separately, was not worth the trouble and expense of the search.and subsequent litigation. But while these considerations might Nave some weight, if the question of adequate price wore', otherwise in doubt, they can go but, a little way to establish that point, in the circumstances of the present case.
Martin’s' share of the profits were $30,000, for which Brooks gave him substantially nothing.
Was Martin placed by Brooks in possession of all the information known to himself, and which was necessary to enable Martin to form a sound judgment of the value of what he was selling ? .
[His honor here examined the evidence on this question of fact, — some of it of an inferential kind, — minutely, and went, on thus]:
But we are not left alone to this negative and inferential testimony on the subject. We have letters from Brooks to the Fields, written before the.sale was made, in which he urges that all remittances shall be made to him at Washington, showing from the allusions in them tó a proposed remittance to Martin, and to Lake & Co., who were Martin’s correspondents in New York, that his intention was that no .remittance should be made to Martin..- When we consider that the letter of June 2Qth was written at a moment when he was expecting in a few days an' interview with Martin, which he had himself suggested, and that he was no doubt then contemplating the very purchase which he made at the *87 interview, and that he knew that Lake was the other partner in the firm of Martin & Co., we look upon it as remarkable; pointing clearly to one conclusion, namely, a. determination to keep from Martin all the funds of the concern, and all .information of its condition, in order that he might perform the operation of buying Martin’s interest at a sacrifice.
We aré of opinion, from a careful examination of - the testimony, that Brooks occupied towards Martin a relation of confidence and trust, being his partner, his agent, and his brother-in-law, and having also entire control of the partner-' ship business; that he took advantage of this position to', conceal from Martin the ^prosperous condition of the concern, and purchased'from him his interest, for a price totally • disproportioned to its real value; and that, under such cir-' cumstapces, it is the unquestionable duty of a court of chancery to set aside the contract of sale.
Decree affirmed with costs. .

 17 Massachusetts, 281.

 12 East, 804.

 2 Caines, 149.

 2 Phillips's Ch. 801.

 1 Bosanquet & Puller, 3.

 Id. 29.

 7 Vesey, 473

 17 Howard, 232.

 Equity Jurisprudence, § 323.

 1 Story's Equity, § 323.

 Id. § 220.

 9 Vesey, 234.

 See, also, Michoud v. Girod, 4 Howard, 503; Bailey v. Teakle, 2 Bockenborough, 51-54; Hunter v. Atkyns, 3 Mylne & Keene, 113; Maddeford Austwick, 1 Simons, 89.

 The court here made a computation giving this result.