CASE 69—ACTION FOR A SETTLEMENT OF PARTNERSHIP ACCOUNTS.—
Feb. 4.

# Central Trust & Safe Deposit Co., &c. v. Respass.

### APPEAL FROM KENTON CIRCUIT COURT.

JUDGMENT GRANTING RELIEF SOUGHT AND DEFENDANT'S APPEAL.  RE-
VERSED.

PARTNERSHIP IN TRAINING AND RACING HORSES—CREDIT TO SURVIVING
PARTNER FOR MONEY PAID OUT AFTER DISSOLUTION—MONEY LOST
AT GAMING—ACCOUNTING OF PROFITS IN ILLEGAL BUSINESS.

1. The business of breeding, training, and racing horses for purses
being legal, a partnership for that purpose may be settled by the
chancellor.

2. A surviving partner in such business was entitled, in a settlement,
to credit by money paid out by him after the death of his co-
partner for training horses of the firm, as it was proper to keep
them in condition for racing, that they might sell to better ad-
vantage for settlement purposes; and he was also entitled to credit
for money paid for entering the horses in stakes after his co-
partner's death, as the payment put them in readiness to be
raced, and thus added to their value in the market.

3. A partner in the business of racing horses is not entitled, in a set-
tlement, to credit by money lost and paid by him on a bet made
for the firm; betting upon horse races being illegal.

4 A court of equity will not entertain a bill for an accounting of
profits in the case of a partnership in the business of "book-
making," or of making wagers on horse races; the business being
illegal.

GUSTAVUS H. WALD, ATTORNEY FOR APPELLANTS.

CHAS. B. WILBY, L. J. CRAWFORD AND W. A. BYRNE, OF COUNSEL.

### POINTS AND AUTHORITIES.

1. Death of a partner terminates the partnership, and the survivor can
not create new liabilities against the firm:  Cook v. Carson,
45 Tex., 429, 430; Remick v. Ewing, 42 Ill., 342; Forrester v.
Oliver, 1 Ill. App., 259; Story on Partnership, section 343.

2. A set-off or counter-claim must contain all the elements of a valid
cause of action: Carroll's Kentucky Code, pp. 81-83; Williams v.

Central Trust & Safe Deposit Co., &c. v. Respass.

Gilchrist, 3 Bibb., 49, 50; Same v. Same, 3 A. K. Marshall, 235; Hayes v. Goodwin, 4 Metcalfe, 80, 83; Smith v. Maupin, 4 Ky. Law Rep., 359, Syll. 3; King v. Goddard, 8 Ky. Law Rep., 150.

3. By the common law of this country, all wagers are illegal and void as being against public policy: Irwin v. Williar, 110 U. S. at p. 510; Dickson's Exr. v. Thomas, 97 Pa. St., 278; Gregory v. Wendell, 40 Mich., 432; Melchert v. A. U. Tel. Co., 3 McCrary, 521, S. C. 11 F. R., 193 and note; Lyon v. Culbertson, 83 Ill., 33; Barnard v. Bockhaus, 52 Wis., 593; Kingsbury v. Kirwan, 77 N. Y., 612; Story v. Salomon, 71 N. Y., 420; Love v. Harvey, 114 Mass., 80.

4. "Bookmaking" on races is gambling, and illegal: Shaffner v. Pinchback, 133 Ill., 410; Swigert v. People, 154 Ill., 284; Bollinger v. Commonwealth, 98 Ky., 574; Sharp v. Commonwealth, 98 Ky., 574; Wharton on Evidence, section 314.

5. One partner can not maintain against another, a bill for an account of profits gained in an unlawful business: Everet v. Williams, 9 Law Quarterly Review, 197-199; McMullen v. Hoffman, 174 U. S., 639; Sykes v. Beadon, 11 Ch. Div., 170; Watson v. Fletcher, 7 Grattan, 1; Shaffner v. Pinchback, 133 Ill., 410; Goodrich v. Houghton, 134 N. Y., 115; Roselle v. Farmers' Bank, 144 Mo., 36; Snell v. Dwight, 120 Mass., 9; Morris v. Bennett, 20 Montana, 560; King v. Winants, 71 N. Car., 469; Watson v. Murray, 23 N. J. Eq., 257; Gould v. Kendall, 15 Neb., 549; Craft v. McConoughy, 79 Ill., 346; Northrup v. Phillips, 99 Ill., 449; Wiggins v. Bisso, 92 Tex., 219; Emery v. Ohio Candle Co., 47 O. S., 320; Hunt v. Pfeiffer, 108 Ind., 197; Railway Co. v. Railway Co., 61 Fed. Rep., 993; Cannan v. Bryce, 3 Barn. & Ald., 179.

6. If a part of a partnership business be legal and a part illegal, the court will take charge of that part which is lawful, in an action to settle the affairs of the partnership: Anderson v. Powell, 44 Ia., 20; Kowles v. Haughton, 11 Vesey, 168.

We submit the following additional points and authorities which have come to our notice since the filing of our original brief.

"Where a contract is forbidden by the law of the State in which it is sought to be enforced, and the party seeking to enforce it relies on the fact that it was made in a foreign State, and was valid by the law of that State, he is bound to aver and prove the fact, that it is valid by the law of the *lex loci contractus*." Gist v. Telegraph Co., 45 South Carolina, 344, 370, (S. C., 23 S. E. Rep., 143, 152.)

Even if the business of bookmaking was lawful in Illinois, this court would not recognize an alleged right based on it: Clark v. Tanner. 100 Ky., 275, 280; Rogers v. Raines, 100 Ky., 295, 300.

And so if it were lawful here, the Illinois courts would not recognize the validity of the transaction if made here and sued upon there: , Pope v. Hanke, 155 Ill., 617.

Courts of a State where gambling is illegal will not recognize or enforce alleged rights arising out of gambling transactions, conducted in a State where the gambling was legal: Minzeshimer v. Doolittle S. C. New Jersey, 45 Atl. Rep., 611; Gooche v. Faucette, 122 North Carolina, 270; Gist v. Telegraph Co., 45 South Carolina, 344, 23 S. E. R., 143; Martin v. Richardson, 94 Ky., 183; Wharton on Evidence, sec. 314; Greenleaf on Evidence, (15th ed.) sec. 43 note (c); Shaffner v. Pinchback, 133 Ill., 410; Swigert v. People, 154 Ill., 284; Bollinger v. Commonwealth, Sharp v. Commonwealth, 98 Ky., 574; Hilton v. Guyot, 159 U. S., 113, at 210; Harding v. Amer. Glucose Co., Ill., 55 N. E. Rep., 577, 606.

B. F. GRAZIANI, ATTORNEY FOR APPELLEE.

The case, stripped of all unnecessary verbiage which the brief of appellants somewhat contains, the admitted facts of the case are these:

James B. Respass and Solomon Sharp had formed a co-partnership of several years standing, and they were the owners of race horses, and, in connection with that business, were engaged in pool selling, or opening a book for the purpose of selling pools on horse races: that this business continued for several years, when suddenly Solomon Sharp, one of the partners, died in Cincinnati, Ohio, and left at the time of his death a large number of race horses in the possession of his partner, Jerome Respass, who had them in training or stabled in Campbell county, Ky. These horses were a part of the assets of the estate of Sol. Sharp. Likewise at the time of his death there were $4,725, which he had placed in bank to his own name, which he, Sharp, had won from races in Chicago, Ill., one-half of which belonged to his partner, Respass, as stated in the depositions of the bookkeeper.

## CONTENTION,

Appellee contends that the assets from the sales and winnings ought to be equally divided—first paying, however, to Respass for the keeping of the horses after the death of Sharp. It was absolutely necessary for the preservation of the large number of valuable horses left in the hands of Respass at Sharp's death, that they should be well cared for in rubbing, caring for and feeding them, until such time when the court should make an order to sell them as perishable property, which it did.

Appellant contends that the estate of Sharp is not bound to account for, or ought not to pay half of the money won on races, as it was an illegal transaction, but that Sharp's executors are entitled to one-half of the sale of the horses.

Appellant further contends that the business was legal as to the running of horses for purses, but illegal as to the receipts for bookmaking, and that appellant's estate can not now be called to an accounting of the profits or of the capital for such illegal business.

Conceding that the business was illegal as to the receipts from bookmaking, nevertheless the conclusion that an accounting can not be required, does not follow. Courts of justice will never interfere to enforce an illegal contract, nor sustain an action that can only be sustained by enforcing and giving effect to an illegal agreement, but when the appellant is called to an accounting in a court of justice, our contention is, that he is never permitted to set up that the fund as to which he is called to account was created in some illegal way. The distinction being, that the illegal matter is closed and completed, and public morals will not be, in any manner, affected by what the court is asked to do between the parties.

This case is not a matter of enforcing illegal obligations, or an illegal contract, but is a suit for the recovery of realized profits of these two partners.

## AUTHORITIES.

The cases cited herein are as follows, to-wit: Martin v. Richardson, 94 Kentucky, page 183; Bibb, &c., v. Miller, &c., 11 Bush, 306; Armstrong v. Toler, 11 Wheat., 258; Catts v. Phalan, &c., 2 How., 376; Story on Conflict of Laws, secs. 248, 249; Story on Contracts, sec. 760; Farmer v. Russel, 1 B. and P., 295; Wilson v. Owens, 30 Mich., 474; Rathrock v. Perkinson, 61 Ind., 39; Tenant v. Elliott, 1 Bos. and P., 39; Farmer v. Russell, 1 Bos. and P., 29; Thompson v. Thompson, 7 Ves., 473; De Lorma Brooks, Appellant v. Warrick Martin, Appellee, 69 U. S. Supreme Court Reports, page 70; Russell v. Wheeler, 17 Mass., 231; Scheffner v. Gordon, 12 East., 304; Belding v. Pitkin, 2 Caines, 149; Sharp v. Taylor, 2 Phillip's Ch., 801; Wilson v. Owen, 30 Mich., 437; Harris v. White, 81 N. Y., 532; Norton v. Blinn, 39 Ohio St., 145; Irwin v. Williar, 110 U. S., 510; Dixon's Executor v. Thomas, 97 Penna. St., 278; Gregory v. Wendall, 40 Mich., 432; Lyon v. Culbertson, 83 Ill., 33; Melcher v. American Union Telegraph Co., 3 McCrary, 521; S. C., 11 Fed. Rep., 193 and note; Barnard v. Backhaus, 52 Wis., 593; Kingsbury

v. Kirwin, 77 N. Y. 1, 612; Story v. Salomon, 71 N. Y., 420; 59 U. S. Supreme Rports, page 386; Sharp v. Taylor, 2 Philch, 1; Tenant v. Elliott, 1 B. and P., 3; Farmer v. Russell, 1 B. and P., 296; Israel Kinsman *et al.* v. Stephen R. Parkhurst, 59 U. S. Supreme Reports, page 386; Sharp v. Taylor, 2 Phelch, 801; Tennant v. Elliott, 1 B. and P., 3; McBlear v. Gibbs, 17 How., 236 (58 U. S. Supreme Reports, 134) Petre v. Hannay, 3 T. R., 418; Armstrong v. Toler, 11 Wh., 258; Manchester & Lawrence Ry. Co. v. Concord Ry. Co., 9 L. R. A., 689.

## ADDITIONAL CITATIONS BY APPELLEE.

Maize v. Bradley, 23 Ky., 993; Brooks v. Martin, 2 Wallace, 70; Planters' Bank v. Union Bank, 16 Wallace, 479; Armstrong v. American Exchange Bank, 113 U. S., 433; Irwin v. Irwin, 21 Ky., 624; Bibb v. Miller, 11 Bush, 309; Lovejoy v. Kaufman, 41 S. W., 507; Pfeiffer v. Maltby, 38 Tex., 523; Gilliam v. Brown, 43 Miss., 641; Hardin Gray v. William Roberts, 2 A. K. Marshall, 208; Phalan v. Clark, 19 Conn., 421; Luggett v. Goodrich, 20 La., Ann., 165; Collyer on Partnership, sec. 324; Collyer on Partnership, sec 546; Story on Partnership, secs. 325 and 343.

OPINION OF THE COURT BY JUDGE DURELLE—REVERSING.

Jerome B. Respass and Solomon L. Sharp appear to have formed a copartnership, extending over several years, in the business of managing a racing stable, and, in connection with that business, were engaged in "bookmaking," or making wagers upon race horses. They seem, also, to have had an interest in a pool room at Newport. For the book bus-iness a separate account was kept by a cashier employed for the purpose. They had no regular time for making settlements with each other, but at various times, when requested, the cashier made out statements of the booking business of the firm. It appears from the testimony of Bernard, the cashier, that Sharp in November, 1897, handed him $4,724, and told him to deposit it to his (Sharp's) credit in the Merchants' National Bank of Cincinnati, Ohio, which was done. Sharp appears to have stated at the time that

one-half of this fund belonged to Respass. It appears further that this was the "bank roll" of the bookmaking concern, in which each partner had an equal interest. At the same time he remarked that Respass had paid out $1,500 for the firm, and that he would see him in a few days and settle with him. Sharp died suddenly, before any such settlement was made. The money in the bank roll was on deposit to Sharp's credit. The racing business of the firm seems to have been almost entirely in the hands of Respass, who attended to the horses, trained them, entered them in races, and at times wagered on them for the benefit of the firm, which divided the profits or shared the losses, as the case might be. Respass brought suit against Sharp's executors for a settlement of the partnership accounts. The horses in the racing stable were sold under order of court, and various claims against the fund in court were made by Respass for expenses incurred in keeping, shoeing, clipping, training and caring for the various horses, as well as for entering certain of the horses in stakes, and for wagers paid upon the horses "Fair Deceiver" and "Shannon." The business of breeding, training and racing horses for purses is legal. The partnership for that purpose can undoubtedly be settled by the chancellor. The only question presented as to this matter is upon the correctness of the settlement made.

The item of $2,815 in the claim of Respass against the firm assets, and which was allowed by the trial court, is, in part, a charge for training and keeping 10 horses of the firm from November 10, 1897, to April 9, 1898—149 days— at $1.50 per day for each horse, and is objected to as being in great part for expenses incurred in carrying on the partnership after it had been dissolved by the death of one of the partners. These charges would seem to an outsider to

be somewhat exorbitant. But the trial court appears to have allowed them upon the theory that the horses being race horses, and unfit, or, at all events, less valuable, for any other purpose than that of being either raced, or sold for racing purposes, it was proper to keep them in condition for racing, as only by doing so could they be kept in good condition for a sale for settlement purposes. We are not inclined to disturb the chancellor's finding in this behalf.

The same objection is made to a charge of $80 paid for entering the horses in stakes after Sharp's death; and while we should not have been inclined to disturb the chancellor's ruling, had he disallowed this item, we think it may possibly be justified upon the same theory upon which we have allowed the charge for training the horses—that is, that the most profitable market for race horses is that in which they are sold to be raced; that, to supply the demand for this market, it is requisite that they should be ready to be raced—not only in physical condition, but ready in the further fact that their entrance fees in stake races have been. paid, which secures them the privilege of running in those races, and which payment seems required to be made at fixed periods before the races are run. Upon this item, and the item for shoeing the horses with racing plates, we shall not disturb the finding of the chancellor, but shall assume them to be, as he found them, charges for conditioning the horses for sale at the highest price in the most profitable market.

Another item to which exception is taken consists of $700; being the amount of two bets made, lost and paid by Respass on the horse "Fair Deceiver" and "Shannon." In view of the statutory law of Kentucky (see section 1955 *et seq.*, Kentucky Statutes), we are unable to see how any legal consideration can exist from a promise to reimburse

to a partner any portion of any sum lost upon a bet on a horse race. In Lyons v. Hodgen, 90 Ky., 280 (12 R., 211), 13 S. W., 1076), it was held, in an opinion by Chief Justice Lewis, that this statute, providing that "every contract, conveyance, transfer or assurance, for the consideration in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime, wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming or wagering to a person then actually engaged in betting, gaming or wagering, shall be void"—applied to dealing in "futures;" that the process by which the money was won or lost was a wager, within meaning of the statute, which was designed to embrace every species of wagering, whether practiced at the time the statute was enacted, or since devised. And in the opinion by the same judge in Sharp v. Com. (from Kenton county), 98 Ky., 574, 35 S. W., 553, it was held that betting upon horse races was gaming and illegal. We think it is well settled that a man who lends money to another, to be then bet on a horse race, can not recover it back. And so it would seem that if A. agrees with B. that B. shall advance the money, and himself bet upon a horse race for their joint account, no action will lie by B. to compel A. to respond for his share of a bet which is lost. The statement of this proposition seems to decide it. It is a contract for an illegal venture. The whole contract is illegal. No right of action can arise out of that contract. This is exactly the position of Respass as to the two bets. He advanced the money to make them for himself and Sharp, relying upon Sharp's express or implied agreement to pay half the losses if loss should be incurred. Such a contract can not be enforced in this State.

A closer question is presented by the claim for a division of the "bank roll." This $4,724 was, as found by the chancellor, earned by the firm composed of Respass and Sharp in carrying on an illegal business—that of "bookmaking"—in the State of Illinois. But though this amount had been won upon horse races in Chicago, it is claimed that, though secured illegally, "the transaction has been closed, and the appellee is only seeking his share from the realized profits from the illegal contracts, if they are illegal." On the other hand, it is claimed for appellants that, as to the bank roll, this proceeding is a bill for an accounting of profits from the business of gambling.

It does not seem to be seriously contended that the business of "bookmaking," whether carried on in Chicago or in this Commonwealth, was legal, for by the common law of this country all wagers are illegal. Irwin v. Williar, 110 U. S., 510 (4 Sup. Ct., 160, 28 L. Ed., 225). One of the most interesting cases upon this subject is that of Everet v. Williams—the celebrated Highwaymen's Case—an account of which is given in 9 Law Quart. Rev., 197. That was a bill for an accounting of a partnership in the business of highwaymen, though the true nature of the partnership was veiled in ambiguous language. The bill set up the partnership between defendant and plaintiff, who was "skilled in dealing in several sorts of commodities;" that they "proceeded jointly in the said dealings with good success on Hounslow Heath, where they dealt with a gentleman for a gold watch;" that defendant had informed plaintiff that Finchley "was a good and convenient place to deal in," such commodities being "very plenty" there, and if they were to deal there "it would be almost all gain to them;" that they accordingly "dealt with several gentlemen for divers watches, rings, swords, canes, hats, cloaks,

horses, bridles, saddles, and other things, to the value of £200 and upwards;" that a gentleman of Blackheath had several articles which defendant thought "might be had for a little or no money, in case they could prevail on the said gentleman to part with the said things;" and that, "after some small discourse with the said gentleman," the said things were dealt for "at a very cheap rate." The dealings were alleged to have amounted to £2,000 and upwards. This case, while interesting, from the views it gives of the audacity of the parties and their solicitors, sheds little light upon the legal questions involved, for the bill was condemned for scandal and impertinence; the solicitors were taken into custody, and "fyned" £50 each for "reflecting upon the honor and dignity of this court;" the counsel whose name was signed to the bill was required to pay the costs; and both the litigants were subsequently hanged, at Tyburn and Maidstone, respectively; while one of the solicitors was transported. This case is found referred to in the cases of Sykes v. Beadon, 11 Ch. Div., 170, 195, and McMullen v. Hoffman, 174 U. S., 639 (19 Sup. Ct., 839, 43 L. Ed., 1117). In the Sykes case it was held, in the opinion by Sir George Jessel: "It is no part of the duty of a court of justice to aid either in carrying out an illegal contract, or in dividing the proceeds arising from an illegal contract between the parties to that illegal contract. In my opinion, no action can be maintained for the one purpose more than for the other." In Watson v. Fletcher, 7 Grat., 1, the business of the firm had been the operation of a faro bank. One of the partners having died, the survivor sought an accounting of profits earned. The syllabus reads: "A court of equity will not lend its aid for the settlement and adjustment of the transactions of a partnership for gambling. Nor will it give relief to either partner against the

other, founded on transactions arising out of such partnership, whether for profits, losses, expenses, contribution, or reimbursement." To the same effect in Shaffner v. Pinchback, 133 Ill., 410 (24 N. E., 867, 23 Am. St. Rep., 624). In McMullen v. Hoffman, supra, it appeared that a partnership was formed for the purpose of obtaining a public contract by unlawful means, upon the terms of sharing the profits equally, and that the profits came into the hands of one partner. The other filed a bill for an accounting, and was denied relief. Said the court: "We must, therefore, come back to the proposition that to permit a recovery in this case is, in substance, to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for defendant who sets it up, but only on account of the public interest. . . . To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined they will be to enter into them. In that way the public secures the benefit of a rigid adherence to the law." See, also, the cases of Snell v. Dwight, 120 Mass., 9; Morrison v. Bennett, 20 Mont., 560 (52 Pac., 553, 40 L. R. A., 158); King v. Winants, 71 N. C., 469 (17 Am. Rep., 11); Watson v. Murray, 23 N. J. Eq., 257; Gould v. Kendall, 15 Neb., 549 (19 N. W., 483); Craft v. McConoughy, 79 Ill., 346 (22 Am. Rep., 171); Northrup v. Phillips, 99 Ill., 449; Wiggins v. Bisso, 92 Tex., 219 (47 S. W., 637, 71 Am. St.

Rep., 837); Chicago, M. & St. P. R. Co. v. Wabash, St. L. & P. R. Co., 9 C. C. A., 659 (61 Fed., 993); Emery v. Candle Co., 47 Ohio St., 320 (24 N. E., 660, 21 Am. St. Rep., 819); Hunter v. Pfeiffer, 108 Ind., 197 (9 N. E., 124).

Upon the other hand, a large number of cases are relied on on behalf of appellee. Many of these cases do not seem to us to bear directly upon the question here involved. We shall first consider the Kentucky cases:   In Bibb v. Miller, 11 Bush, 306, the contest was between two persons, each of whom claimed title to the proceeds of a winning lottery ticket   The court was careful to say:   "The question as to the legality of the sale of tickets and the distribution of prizes arises collaterally, and derives its importance solely from the fact that the plaintiffs in the action are compelled to rely on such sale and distribution in order to make out their title to the fund in controversy."   In that case the corporation had recognized its obligation to pay, and voluntarily paid into court the amount claimed to be due on the coupon.   The question there was whether the library company was acting pursuant to legal authority in selling the ticket and paying the prize distributed to that ticket; and the court held that, "in the absence of proof to the contrary, we must assume that it acted within the scope of the powers granted it by its act of incorporation."   In Martin v. Richardson, 94 Ky., 183 (14 R., 847, 21 S. W., 1039, 19 L. R. A., 692, 42 Am. St. Rep., 353), a lottery ticket owned by one man had been fraudulently obtained from him by another, and the proceeds collected.   It was held that, the purchase of the ticket not being shown to have been made in a State where such purchase was illegal, the presumption was in favor of its legality.   In Irwin v. Irwin (22 R.; 622), (52 S. W., 927), a lottery ticket, or its proceeds, was given by

a husband to his wife, and invested in real estate. It was held that, "whether the purchase was illegal or not, such transfer comes distinctly within the meaning and purview of the peremptory statute which requires the restoration of property obtained directly or indirectly from or through the other party by reason of the marriage." So, in Maize v. Bradley (23 R., 993), (64 S. W., 655), where, in an action to recover money had and received, it was claimed the fund had been placed in the hands of defendants to avoid taxation, it was held this defense was not available, as the fund had been reinvested, and a new contract entered into between the parties, untainted by the illegality of the original transaction. In the case at bar there was no division of the unlawful gains made by Sharp at Chicago. There was no new transaction with reference to them, such as the investment of the fund, or any part of it, in horses, for their joint account. There was not even an accounting of the gains, accompanied by a promise to pay Respass the amount ascertained to be due him under the terms of the illegal partnership agreement. There was simply a termination by death of an illegal partnership, with unlawful gains in the hands of one of the partners, an accounting for which is here sued for. We are cited to but two cases which seem to come up to the requirements of appellee's contention. Both of these cases have been subsequently questioned. There are many cases which come within the general terms of the doctrine laid down in Norton v. Blinn, 39 Ohio St., 145: "Public policy does not require that one engaged in an unlawful enterprise should, by pleading it, shield himself from liability for the wages of his employes, agents or servants. . . . It is contrary to public policy and good morals to permit employes, agents, or servants to seize or retain the property of their

principal, although it may be employed in illegal business and under their control. No consideration of public policy can justify such a lowering of the standard of moral honesty required of persons in these relations. And again, if parties to an illegal contract waive the illegality and honesty account as between themselves, no other person can be heard to complain of such accounting. Hence we think that, if in making such settlement, one of the guilty parties should deliver property or money to an agent of another, to be delivered by the agent to his principal, such agent is bound to account therefor to his principal." It seems clear, also, that a wrongdoer who, by force or fraud, obtains money or property from another, or violates a trust imposed in him, can not be heard to charge his victim with wrongdoing in the original obtention of the money or property. To this class belong the cases of Farmer v. Russell, 1 Bos. & P., 295; Tenant v. Elliott, Id., 2; Catts v. Phalen, 2 How., 376, 11 L. Ed., 306. And see Pol. Cont., 334, note. The doctrine as to such cases is aptly stated in Cattes v. Phalen, supra: "Phalen & Morris had in their possession twelve thousand five hundred dollars, either in their own right, or as trustees for others interested in the lottery. No matter which, the legal right to this sum was in them. The defendant claimed and received it by false and fraudulent pretenses, as morally criminal as by larceny, forgery, or perjury; and the only question before us is whether he can retain it by any principle or rule of law." The cases which come nearest to supporting the contention of appellee are Sharp v. Taylor, 2 Phil. Ch., 801, and Brooks v. Martin, 2 Wall., 70 (17 L. Ed., 732). The former case was a partnership in a vessel registered in violation of the laws of both Great Britain and the United States. Her voyages were profitable, but one partner, colluding with an outsider,

obtained possession of the profits and refused to account.
The illegality of the traffic was relied on by him as a de-
fense to an accounting.  Said Lord Cottenham:  "He is not
seeking recompensation and payment for an illegal voyage.
That matter was disposed of when Taylor (the defendant)
received the money, and plaintiff is now only seeking pay-
ment for his share of the realized profits.  .  .  .  As be-
tween these two, can this supposed evasion of the law be
set up as a defense by one as against the otherwise clear
title of the other?  Can one of two partners possess him-
self of the property of the firm, and be permitted to re-
tain it, if he can show that in realizing it some provision
in some act of parliament has been violated or neglected?
.  .  .  The answer to this, as to the former case, will be
that the transaction alleged to be illegal is completed and
closed, and will not be in any manner affected by what the
court is asked to do between the parties."  This doctrine
comes very close to appellee's contention, but, on examina-
tion, can be distinguished from the case at bar, and had
been criticised and denied by Sir George Jessel, master of
the rolls, in Sykes v. Beadon, supra, as well as in the case
of McMullen v. Hoffman, 174 U. S., 639 (19 Sup. Ct., 839,
43 L. Ed., 1117).  The case of Brooks v. Martin, 2 Wall., 70
17 L. Ed., 732)—much relied upon by appellee—is explained
and qualified by the supreme court in McMullen v. Hoffman,
supra, page 668, 174 U. S., page 850, 19 Sup. Ct., and page
1128, 43 L. Ed., in the opinion by Mr. Justice Peckham:
"The action was sustained upon the theory that the pur-
pose of the partnership agreement had been fully closed
and completed, that substantially all the profits arising
therefrom had been invested in other securities or in lands,
and that therefore it did not lie in the mouth of the part-
ner who had by fraudulent means obtained possession and
control of these funds to say to the other that the original

contract was illegal." The case is also criticised in King v. Winants, 71 N. C., 473, 17 Am. Rep., 11, as follows: "Two men enter into a conspiracy to rob on the highway, and they do rob, and while one is holding the traveler the other rifles his pocket of $1,000, and then refuses to divide, and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy and the rencounter and treachery. Will a court of justice hear them? No case can be found where a court has allowed itself to be so abased. Now, if the robbers had taken the $1,000 and invested it in some legitimate business as partners, and had afterwards sought the aid of the court to settle up that legitimate business, the court would not have gone back to enquire how they first got the money. That would have been a past transaction, not necessary to be mentioned in the settlement of the new business. And this illustrates the case of Brooks v. Martin, supra, so much relied on by plaintiff." See, also, Snell v. Dwight, 120 Mass., 9, 19; Morrison v. Bennett, 20 Mont., 500, 560, 52 Pac., 553, 40 L. R. A., 158; Gould v. Kendall, 15 Neb., 549, 556, 557, 19 N. W., 483; Wiggins v. Bisso, 92 Tex., 219, 225, 47 S. W., 637, 71 Am. St. Rep., 837.

We conclude that in this country, in the case of a partnership in a business confessedly illegal, whatever may be the doctrine where there has been a new contract in relation to, or a new investment of, the profits of such illegal business, and whatever may be the doctrine as to the rights or liabilities of a third person who assumes obligations with respect to such profits, or by law becomes responsible therefor, the decided weight of authority is that a court of equity will not entertain a bill for an accounting.

The judgment of the chancellor is therefore reversed, and the cause remanded, with directions to enter a judgment in accordance with this opinion.