CARLISLE v. SMITH et al.

(District Court, N. D. Georgia. July 17, 1916.)

No. 28.

1. EQUITY ⟝410(7)—FINDING BY MASTER—EFFECT—CONFLICTING TESTIMONY.
    There is a presumption in favor of the report of the master based on conflicting testimony.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 916–919; Dec. Dig. ⟝410(7).]

2. CONTRACTS ⟝121—VALIDITY.
    A contract whereby an officer of a corporation agreed for compensation to assist others to gain control of the company by buying in the stock is unenforceable, being in conflict with the duty which he owed the shareholders as an officer, and this is so regardless of the purity of his motives and his good faith.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 504; Dec. Dig. ⟝121.]

3. CONTRACTS ⟝140—ILLEGAL CONTRACTS—EFFECT OF.
    An officer of a corporation entered into a contract to assist third persons to gain control of a company. After the contract was carried out, he rendered other services for such persons in connection with the consolidation of that corporation with others. *Held*, that while no recovery could be had under the contract which was illegal, recovery on the quantum meruit might be had for services rendered thereafter, for they were independent of the invalid contract.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 713–721; Dec. Dig. ⟝140.]

⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. WORK AND LABOR ☞29(2)—RECOVERY—QUANTUM MERUIT.

Where a contract for an officer of a corporation to assist defendants to obtain control was invalid because of his official relation, and after defendants had obtained control, the former officer rendered services assisting them in consolidating such corporation with others, the limit of his recovery for such services is their value, taking into consideration his fitness for the work, its nature and his diligence, but the profits received by defendants cannot be considered.

[Ed. Note.—For other cases, see Work and Labor, Cent. Dig. § 57; Dec. Dig. ☞29(2).]

In Equity. Suit by W. A. Carlisle against C. Elmer Smith and others. On report of master. Decree in part for complainant.

See, also, 224 Fed. 231.

Anderson & Rountree, of Atlanta, Ga., and W. C. Wright, of Newnan, Ga., for plaintiff.

H. H. Dean, of Gainesville, Ga., and Robt. C. & Philip H. Alston, of Atlanta, Ga., for defendants.

NEWMAN, District Judge. The business of the court is such and my time is so occupied with official business that I cannot go as extensively into the facts and law of this case as perhaps the character of the case and the rather extensive argument of counsel and the voluminous briefs furnished me would justify. I simply state my conclusions briefly but, I trust, so that they may be understood. These conclusions are:

[1] First: The conclusion of the special master that there was no agreement between Carlisle and Smith and Ashley by which they entered into a partnership or "joint adventure," to divide among them any profits that might arise from the reorganization or rehabilitation of the North Georgia Electric Company, must be upheld.

The evidence in the case is sharply conflicting, and the special master, after hearing it all and weighing it, decided favorably to Smith and Ashley. Under any rule with reference to the weight to be given a master's report I think the court would be required to sustain the master in this respect. No attempt is made anywhere to impeach any of the witnesses testifying on this subject. Ashley and Smith are apparently business men of good standing where they live, and Carlisle is a man of excellent repute in this state. It is to be hoped that expressions here and there in the many conversations between the parties were misinterpreted and that all of them are trying to tell the truth about the thing as they understood it. It is hard to believe that men like these would willfully and deliberately swear to a falsehood to make money, and I do not think it is necessary to find that they did that, nor can I see that any of them willfully testified to anything they did not believe to be true at the time.

Of course the presumption in any case of reference such as this is in favor of the master's report, especially where he finds on conflicting testimony. All of the exceptions to the findings of the master with reference to this, therefore, are overruled.

[2] Second: I am satisfied that, under the law, with Carlisle's re-

lation to the North Georgia Electric Company, being most of the time during which these transactions occurred the president and for a short time vice president, and all the time being officially related in some way to the company, a contract between him and other people, to do work for and accept compensation from other parties dealing with his company, the dealings on behalf of the third parties seeming to be antagonistic to the rights of the electric company, would be illegal and nonenforceable. It is claimed here, as I understand it, that what Carlisle did, while he was purchasing the stock of the North Georgia Electric Company for other people and for interests represented by Smith and Ashley, was really benefiting the stockholders of that company because the company was in such a situation at the time the dealings were entered into that their stock was valueless, and that he really gave them more for their stock than they could have expected to realize otherwise. Even if this should be true and conceding it, it is not what really occurred in a transaction like this, where an officer of a corporation undertakes to assist parties who are dealing with the corporation, but it is the principle which controls; it is what the sanctioning of such transactions could lead to and necessarily in many, if not in most, cases would lead to. That is to say, where a person is an officer of a corporation and undertakes to assist others who are attempting to acquire control of the corporation, whether the results are beneficial to the stockholders or not, the consideration is what the result of sanctioning such transactions would be.

In the opinion in McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, the part I am referring to being on page 647 of 174 U. S., on page 842 of 19 Sup. Ct., 43 L. Ed. 1117, Mr. Justice Peckham says:

"The question is not whether in this particular case any member of the water committee did or did not remember the fact that the bridge company had made a bid or that such bid had no effect upon his mind. The question is not as to the effect a particular act in fact had upon a member of the water committee, but what is the tendency and character of the agreement made between the parties; and that tendency or character is not altered by proof on the part of a member of the committee, given several years afterwards, that he had no special recollection that such a bid had been made."

In Richardson v. Crandall, 48 N. Y. 348, 362, the court said, as quoted by Mr. Justice Peckham in McMullen v. Hoffman:

"In all cases where contracts are claimed to be void as against public policy, it matters not that any particular contract is free from any taint of actual fraud, oppression or corruption. The laws look to the general tendency of such contracts. The vice is in the very nature of the contract, and it is condemned as belonging to a class which the law will not tolerate"—citing Atcheson v. Mallon, 43 N. Y. 147.

The case of McMullen v. Hoffman was a case in which McMullen undertook to recover from Hoffman a share in the profit which Hoffman had made and received on a contract with the city of Portland, Or., for the manufacturing and laying of certain pipe in the construction of waterworks for the city of Portland. McMullen and Hoffman entered into an agreement that they should both bid for the work for which the city was receiving bids, and that they should jointly do the

work and share the profits or loss. McMullen's company bid $50,000 more for the work than Hoffman's company. The way the bids were put in is described by the court in the opinion in this way (174 U. S. 645, 19 Sup. Ct. 841, 43 L. Ed. 1117):

"The complainant McMullen, living in San Francisco and being a large stockholder in and manager of the San Francisco Bridge Company, came to Portland for the purpose of giving his attention to the matter, and if possible to make an arrangement with the defendant by which they might together become bidders for the work. He and the defendant had many interviews before the time of delivering the bids arrived, and they finally agreed that each party should put in separate bids in his own or his firm name, or in the name of his company, for certain classes of the work, but that they both should have a common interest in each bid if any were accepted. This community of interest was to be kept secret and concealed from all persons, including the water committee. Each was to know the amount of the other's bid, and all bids were to be put in only after mutual consultation and agreement. Bids for the various classes of work were put in as above set forth, and among them the bid for the manufacture and laying of the pipe, which was accepted by the water committee. All of them were put in pursuant to this agreement, part of them in the name of Hoffman & Bates and part in the name of the San Francisco Bridge Company. The bid in the name of the San Francisco Bridge Company for the manufacture of the pipe was nearly $50,000 higher than the amount bid in the name of Hoffman & Bates, and was put in after consultation with and approval by the defendant. This last bid was put in, as stated by Mr. McMullen in his evidence, as a matter of form only, and to keep the name of his company before the public, but it appeared on its face to be a bona fide bid. The water committee received the bids in ignorance of the existence of this agreement and in the supposition that all the bids which were received were made in good faith, and they all received consideration at the hands of the committee. After the computations were made by which it appeared that the bid of the defendant was the lowest for the manufacture and laying of the pipe, the contract was awarded him, and afterwards that portion of the agreement which had been made between the parties to this combination, viz., that relating to the partnership, was reduced to writing, and is set out."

It is then stated, in substance, that the effect of the bid of McMullen's company would be to cause the water committee of the city, who were considering the bids, to think that that company, bidding in good faith, considered the work worth nearly $50,000 more than Hoffman's company had bid, and in this way would deceive the committee acting for the city.

Further along in the opinion the court says, in reference to the right to recover in a case like this (174 U. S. 654, 19 Sup. Ct. 845, 43 L. Ed. 1117):

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is Potior est conditio defendentis."

The court then cites, considers, and discusses a number of cases bearing upon the question of the right of McMullen to recover his share of the profits made by Hoffman's company under the contract referred to, among the cases being several which have been cited here for the plaintiff. Perhaps the principal one of these cases relied upon

by the plaintiff is that of Brooks v. Martin, 2 Wall. (U. S.) 70, 17 L. Ed. 732. The first headnote will show what was decided in that case. It is this:

"After a partnership contract confessedly against public policy has been carried out, and money contributed by one of the partners has passed into other forms—the result of the contemplated operation completed—a partner, in whose hands the profits are, cannot refuse to account for and divide them on the ground of the illegal character of the original contract."

In the opinion in McMullen v. Hoffman, in discussing the case of Brooks v. Martin, supra, this is said:

"There is a difference between the case" before this court and that case, "because in the latter case the fact existed that the transactions, in regard to which the cause of action was based, were not fraudulent, and they related in some sense to private matters, while in the case before the court the entire contract was a fraud and was illegal, and related to a public letting by a municipal corporation for work involving a large amount of money, and in which the whole municipality was vitally interested. It may be difficult to base a distinction of principle upon these differences. We do not now decide whether they exist or not. We simply say that taking that case into due and fair consideration, we will not extend its authority at all beyond the facts therein stated. We think it should not control the decision of the case now before us."

Concluding this case of McMullen v. Hoffman, the court says:

"It is impossible to refer to all the cases cited from the various state courts regarding this question. Some of them we should hesitate to follow. The cases we have commented upon we think give no support for the claim that the case now before us forms any exception to the rule which, as we believe, clearly embraces it. We must take the whole agreement, and remember that the action is between the original parties to it; that there is no collateral contract and no new consideration and no liability of a third party. The partnership is but a portion of the whole agreement.

"We must therefore come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

This case of McMullen v. Hoffman has been cited in a large number of cases and clearly states the law in reference to the right of one partner to recover from another the profits of an illegal transaction. Vandegrift v. Vandegrift, 226 Pa. 254, 75 Atl. 365, 18 Ann. Cas. 404; 18 Am. & Eng. Ann. Cas., to which an interesting note is attached; Central Trust & Safe Deposit Co. v. Respass, 112 Ky. 606, 66 S. W. 421, 56 L. R. A. 479, 99 Am. St. Rep. 317, in which latter citation there is an extensive note on the question involved here; Kennedy

v. Lonabaugh, 19 Wyo. 352, 117 Pac. 1079, Ann. Cas. 1913E, 133; 30 Amer. & Eng. Ann. Cas. 133.

In Rowley's "Modern Law of Partnership," § 175, it is said:

"As shown in the preceding sections the courts generally will not recognize a partnership contract to carry on an illegal business or to conduct a legal business in an unlawful manner, and will not enforce its claims against third parties nor compel an accounting or contribution between the parties."

It may be conceded that there are contrary authorities, like Brooks v. Martin, supra, in which it is held that where the illegal transaction is completed one party may recover from the other his portion of the profits arising from the illegal transaction. The federal courts, however, must be controlled by the doctrine announced by the Supreme Court of the United States and that, I think, is fully stated and must be gathered from the decision in McMullen v. Hoffman, supra. I think I was inclined to have the contrary view of the law at the time the application for injunction was heard and passed upon in this case, but. I am satisfied now, after a careful examination of the authorities, that if I had such an opinion at that time I was in error about it, and that the law is as I have endeavored to state it briefly herein.

It is claimed on behalf of the plaintiff here, and in reply to this legal proposition of the defendants, that Carlisle's work under the contract between Carlisle on the one part and Smith and Ashley on the other, by which Smith and Ashley were endeavoring to obtain control of the North Georgia Electric Company's stock, being with the stockholders of the North Georgia Electric Company and not with the company itself, as I understand their contention, that therefore the contract is not illegal. I am unable to agree to this under the facts in this case. Carlisle was, as I have stated, either president or vice president of this company during the whole time these transactions were going on, and his agreement with Smith and Ashley, if he had such an agreement, was to obtain control of the company by obtaining all of the stock. Therefore the rule as stated above would, it seems to me, clearly apply.

As I have stated that it is impossible for me to disagree with the master's conclusions under any recognized rule as to the weight to be given such conclusions, it may not be very material what the law is as to this, but inasmuch as it has been argued here that it has an important bearing upon this case, I have stated my conclusions about it.

[3] Third: After the agreement of June 3, 1909, was signed by the stockholders of the North Georgia Electric Company and the Etowah Power Company, by which they agreed to receive stock of the new company in certain proportions for their old stock, Carlisle had completed the work which he did for Smith and Ashley for which it is clear, I think, that no recovery can be had by him, either based upon the express agreement which he says existed or on quantum meruit. And the question which has given me more trouble than any other is whether Carlisle can recover for work he did in furthering the interests of Smith and Ashley, mainly in obtaining property rights and in general work for them in connection with the bringing together of the properties which went into the corporations of the Georgia Power

Company and the Atlanta Power Company, from which corporations the profits made by Smith and Ashley came. That Carlisle did much work for Smith and Ashley which was of great benefit to them and aided them in carrying out their plans for the organization of these new corporations and in getting together the properties which they acquired is beyond question. And unless he is debarred from such recovery because such work was done under what has been held to be an illegal agreement with Smith and Ashley, he would, it seems to me, be entitled to recover the value of his services after his work under the illegal agreement was all completed. I understand the rule laid down in all the cases on the subject of the right to a recovery in a case like this that the test is whether it is necessary to invoke the illegal agreement as the basis of such recovery. In this case, for the work done by Carlisle after July 1, 1909, I think he may recover without setting up the alleged agreement with Smith and Ashley. Clearly from the correspondence in evidence here they called on him repeatedly and continually, after the agreement of June 3, 1909, had been perfected, to do much work in obtaining property and water rights for their benefit. On June 18, 1909, Carlisle wrote to C. Elmer Smith that he had over 65 per cent. of the North Georgia Electric Company and Etowah Power Company stock subscribed to the agreement. It seems entirely probable, therefore (while I have been unable to find anything which shows the date exactly), that this subscription was practically completed by July 1, 1909. After that the correspondence shows that Smith and Ashley were continually calling on Carlisle and Carlisle was continually making reports to them of what he was doing about obtaining property which was necessary for water rights for the development of the properties already obtained and new properties which might be developed if it was thought necessary. And all of this correspondence shows, I think, that they called upon him in such way as to indicate that he was considered to be in their service and employ and that they had the right to call upon him for his services in connection with the work he was doing.

I am not overlooking the fact that the new stock given for the old stock was not actually delivered until long after July 1, 1909, but I do not see that that makes any difference because all of Carlisle's work in obtaining the assent of the stockholders to this arrangement was completed, as I have stated, about the middle of 1909, probably by July 1st.

It is almost impossible to go over all the correspondence between Smith and Ashley on the one side and Carlisle on the other in reference to what he was to do in acquiring property, etc. The first letter I find after July 1st is dated July 6, 1909, from Ashley to Carlisle, in which he was writing him in reference to the Moss agreement, which was connected with the purchase of property at Tallulah Falls. The next is from Smith to Carlisle, of July 7, 1909, with reference to acquiring some rights from the Southern Railway. In this letter Smith refers to the signing of the new agreement, evidently by the stockholders, and it would appear that at that time, so far as Smith knew, the signing was not completed. On July 12, 1909, Smith is still writing to

Carlisle about Tallulah Falls and Southern Railway matters, and asks him again when the stockholders' agreement will be in shape to turn over to him. On August 16th, Smith writes Carlisle with reference to some interests at Buford, and about certain Looper properties. Letter from Smith to Carlisle August 23, 1909, in reference again to the Moss option at Tallulah Falls. On August 24th, another letter from Smith to Carlisle with reference to the Moss property. A letter from Ashley to Carlisle on October 16, 1909, with reference to a certain underwriting agreement. Letter of December 2d, from Ashley to Carlisle, in reference to some transaction with a Mr. Buist. In that, among other things, Mr. Ashley says: "I suggest that you take the matter up with Mr. Buist at once," etc. Letter from Mr. Smith to Carlisle, dated December 16, 1909, in reference to some dealings with a Miss White and her attorney, which I understand to be with reference to some Tallulah Falls property. In this letter Mr. Smith uses the expression: "In the meantime I trust, however, you will not leave this White matter rest." Letter from Smith to Carlisle of December 20, 1909, in reference mainly to arrangements for the purchase of the properties of Miss White and Mrs. Cartledge, also referring to the Moss property, and an expression in that letter is: "Whatever you do, try to get the payments strung out as far as possible," etc. Letter from Ashley to Carlisle of December 21, 1909, with reference to some meeting with Miss White and Mr. Buist, at Tallulah Falls on the 27th. In that Mr. Ashley uses the expression: "Mr. Smith has instructed you with reference to these negotiations and I will write him today informing him of your meeting and asking him to give you further instructions." Letter from Smith to Carlisle of December 23, 1909, in which he mentions several negotiations which they were carrying on, mainly, I believe, with reference to Tallulah Falls properties. In this letter are a number of instructions by Smith to Carlisle. A letter of February 2, 1910, from Ashley to Carlisle relative to some negotiations with the city council of Gainesville. Letter from Ashley to Carlisle of February 18, 1910, about some rights of way along the Louisville & Nashville and the Central of Georgia railroads.

These letters continue all through 1910, and to all of them there were replies from Carlisle and some letters from Carlisle which were answered by Smith and Ashley. They show conclusively that Carlisle was doing work for Smith and Ashley at their instance and request. The character of the requests and often of instructions and express directions, and the apparent acquiescence by Carlisle in all these suggestions and instructions is such that they seem to be unquestionably the basis for an implied assumpsit; that is, an intention on the part of Smith and Ashley and expectation on the part of Carlisle that he would be paid for this work.

I do not think there is anything in this case which authorizes a recovery by Carlisle of a part of the profits made by Smith and Ashley in this matter as such. That is to say, he claims in his suit, as I have stated, that there was a partnership or joint adventure between himself on the one hand and Smith and Ashley on the other, for an

interest in the profits of the enterprise. This, as I have stated, he cannot recover, because I think the finding of the master on that subject must be sustained, and for the further reason that any such contract, even if made, would, in my opinion, be illegal.

So the matter comes in my mind to this: That after the agreement which Carlisle could not have legally made as an officer of the North Georgia Electric Company (and, which I have not mentioned, also an officer of the Etowah Power Company), for obtaining control of the North Georgia Electric Company and the Etowah Power Company for another company, was ended and complete, Carlisle did work for them as to which, from the correspondence and the transactions, and all the facts surrounding the matter, an implied assumpsit must be raised in favor of Carlisle; that is, an implied promise on the part of Smith and Ashley to pay him for his services.

[4] I think the extent of any such recovery must be what Carlisle's services were worth, considering his ability, his especial fitness for the work in which he was engaged, his familiarity with the matters intrusted to him, and the diligence and earnestness with which he pursued them, as well as his success therein. I do not think his recovery is to be judged by the large profits said to have been realized by Smith and Ashley, after Moore and Stevenson came into the matter and after the enterprise assumed a much larger shape than any one could have contemplated at the time the most of the work by Carlisle was being done. Smith and Ashley had put themselves in such advantageous position, by furnishing money and acquiring properties, and putting themselves in such relation to properties, as enabled them to receive very large returns in the way of profits therefrom.

Carlisle must, as I have stated, stand upon the value of his services, and that value must be found in a proper way. The amount to which he is entitled should be ascertained by a reference of the same to a master, or, if it is preferable to the parties, by the court, after hearing from counsel.

Mr. Carlisle has received, as the record shows, $100,000 in the common stock of the Georgia Railway & Power Company from Mr. Moore, and he could only have received this as due him for services in this matter, otherwise it would be the mere purchase of his agreement not to interfere with the consolidation with the Georgia Railway & Power Company. This latter he will hardly insist upon, and the value of this stock must be considered in determining the amount to which he is entitled. No recovery can be had for anything done after January 1, 1911, at which time Carlisle's employment by the Northern Contracting Company began at a salary of $5,000 per annum, as shown by the record.