[Civil No. 1459.   Filed June 2, 1916.]

[157 Pac. 980.]

R. R. RICHARDSON, Appellant, v. BEN HENEY and FRANCIS J. HENEY, Appellees.

1. MINES AND MINERALS—CONVEYANCES—RESCISSION—SUFFICIENCY OF COMPLAINT.—A complaint, in an action to set aside a deed to mining property from one co-owner to another, alleging the existence of a confidential relationship between the parties by reason of the grantee's having the management of the property and having special facilities for acquiring information, the discovery and concealment by the grantee of material facts affecting the value of

the mine, and the sale of the grantor's interest to the grantee for a grossly inadequate consideration, *held* to sufficiently state a cause of action.

2. FRAUD—FRAUDULENT CONCEALMENT—"ACTUAL FRAUD."—The concealment by one party to a transaction of a material fact within his own knowledge, which it is his duty to disclose, is actual fraud.

3. MINES AND MINERALS—CONVEYANCES—FRAUD.—A deed from a part owner of mining property to his co-owner, with whom he was on unfriendly terms, is not subject to rescission merely because the grantee concealed from the grantor, results of development work that increased the speculative value of the property, but disclosed no new or different conditions from those already known to the grantor.

[As to right of grantor to cancellation of deed on ground of misrepresentation by grantee as to condition, value, etc., of property, see note in Ann. Cas. 1912A, 405.]

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. W. A. O'Connor, Judge. Reversed and remanded.

The facts are stated in the opinion.

Mr. Frank H. Hereford and Mr. Frank E. Curley, for Appellant.

Mr. Francis J. Heney, Messrs. Heney & Carr and Mr. Frank J. Duffy, for Appellees.

CUNNINGHAM, J.—The circumstances in which the transaction involved took place are as follows:

On October 14, 1910, a certain mining claim situate in Santa Cruz county, Arizona, was owned by R. R. Richardson and Arthur E. Crepin, the defendants-appellants, and Ben Heney, one of the plaintiffs-appellees, and one Olsen, in audivided portions. The group was initiated many years prior to that date by Richardson, Ed Anderson and Olsen as locators of four mining claims. Subsequently Ben Heney purchased Ed Anderson's three-sixteenths undivided interest in the four claims. Thereafter, nine other locations were added to the group, making the group consist of thirteen locations, so far as Richardson's and Ben Heney's interests were affected. The plaintiffs assert Ben Heney's ownership, in

the nine added locations, to the extent of one undivided one-half interest. This is denied by the answer. In 1906 or 1907, twenty-four additional locations were made by Richardson, Crepin and one Homer Santee, and by Richardson, Crepin and Ben Heney considered as added to the group. Heney asserts a claim of ownership to an undivided one-sixth interest in these twenty-four added locations. This claim is controverted by the defendants.

From the beginning the group was known by the parties, and referred to in this record, as the "Three R group of mines." The annual assessment work had not been done representing said claim for the year 1910, and the performance of such work was necessary to maintain the owners' rights to possession. Richardson and Crepin resided near the mines, and Richardson had at all times assumed the care, management and control over the mines with the consent of the other co-owners.

On October 1, 1910, Richardson sent Ed Bolinger, a miner in his employ, to the mines with instructions to commence the performance of the annual assessment work for the year 1910, and with the discretion to use his own judgment as to the place or places the work should be done, which in Bolinger's judgment would bring the best results in the development of the property. Bolinger was familiar with the mines and with the extensive workings in the property. Richardson employed miners and sent them to the mines to work under Bolinger's direction.

About the date on which Bolinger started the work, viz., October 14, 1910, Richardson called Ben Heney's attention to the fact that the annual assessment work would have to be performed on the claim for the year 1910, and asked for Ben Heney's suggestions as to what he considered should be done about the performance of that work, and if it was Ben Heney's desire to do the work so as to hold the entire group of locations, or to hold a less number. Richardson expressed a view he claimed to entertain with regard to the matter. In recognition of that notice Ben Heney, under date of October 21, 1910, wrote Richardson to the effect that he was making efforts to sell his interests in the mines; that he had made offers to sell his entire interests for the sum of $5,000 on a year's option, in consideration of the taker performing his

share of the assessment work representing the original thirteen locations for the year 1910, and the offer was outstanding at the date of his letter. He conditionally referred to the course he would prefer to take with regard to the performance of the assessment work.

On October 29, 1910, Richardson, answering Ben Heney's letter of October 21st, requested Heney to give him the same terms which Heney stated had been offered to others. On November 1, 1910, Heney made Richardson the offer, specifying the terms and conditions, but limited Richardson's time within which he was at liberty to exercise the option to eleven months; that is, to October 1, 1911, and required Richardson to signify in writing his acceptance or rejection of the offer. On November 6, 1910, Richardson unconditionally accepted Ben Heney's offer in writing as requested.

On March 15, 1911, Richardson represented to Ben Heney that the required annual assessment work had been completed, as agreed, representing the thirteen locations for the year 1910, and requested him to place the deed conveying his interest and the interest of Francis J. Heney, in the group, in escrow, with instructions to be delivered to Richardson upon his payment of the $5,000. On March 22, 1911, Richardson paid Ben Heney $500 of the agreed consideration as a first partial payment, in consideration of Ben Heney's written agreement to secure from Francis J. Heney a sufficient quitclaim deed conveying the Heney interests in the mines to Richardson, and cause the said deed to be placed in escrow pursuant to the said agreement of November 6, 1910.

On April 5, 1911, the said deed was signed by Francis J. Heney and placed in the possession of Ben Heney. Ben Heney subsequently placed the said deed in escrow as agreed, and on September 1, 1911, Richardson paid the balance of the agreed purchase price, and received a delivery of the said deed. This action was commenced November 4, 1913, to rescind the entire transaction set forth above, and to cancel the said deed, to require an accounting and to restore the exact *statu quo* as existed on November 6, 1910, upon the grounds that Richardson had fraudulently concealed material facts which gave to the mines an enhanced value, and the relations existing between himself and Ben Heney were in their nature relations of trust and confidence, and imposed upon Richard-

son a duty to disclose, and precluded him from taking advantage of such superior information to the injury of Ben Heney.

The third amended complaint upon which the cause went to trial set forth the alleged material facts relied upon as concealed and thereby causing the plaintiffs' wrong, in the following language, to wit:

"In the course of said work (under the direction of Henry J. Gray commenced October 1, 1909), Gray disclosed, opened up, proved and demonstrated the existence, position, magnitude and trend of a very large and valuable body of ore, the existence, position, trend and magnitude of which had theretofore been misapprehended and unknown, and immediately communicated the fact of this discovery, disclosure and demonstration to Richardson. . . . Richardson thoroughly understood and appreciated the importance and significance of the disclosure, discovery and demonstration of ore by the said Gray and its effect upon the value and marketability of the property. Richardson thereupon stopped the further prosecution of the work. . . . Richardson did not at this time, and never did, inform the plaintiffs, or either of them, of this work, its purpose or the results thereof."

By a trial amendment to their complaint the plaintiffs allege:

That on or about October 1, 1910, Richardson employed Ed "Bolinger to do work to this end"; to "further open up and disclose and further determine the location, existence, trend and magnitude of the same commercial ore body on the Colossus claim of the Three R group which had been theretofore disclosed, opened up, proved and demonstrated in October and November, 1909, by the work done under the direction of said Henry J. Gray as hereinbefore alleged." That such work was prosecuted "continuously until November 6, 1910, and thereafter for more than one year, and said work prior to November 6, 1910, further opened up and disclosed and further demonstrated the existence, location, trend, and magnitude of the same continuous body of commercial ore on said Colossus claim which was theretofore so disclosed, opened up, proved, and demonstrated by Henry J. Gray so as aforesaid, and further increased and enhanced the value of the Three R group, and made the same even more readily and

easily marketable. . . . Richardson knew . . . the importance
and significance of this Bolinger work. . . . Richardson did
not, prior to November 6, 1910, or subsequently or at all,
prior to the trial of this action, inform the plaintiffs, or either
of them, of the aforesaid facts, . . . but, on the contrary, said
Richardson concealed said facts . . . from said plaintiffs . . .
with the intent of defrauding said plaintiffs . . . by inducing
said plaintiffs . . . to enter into an agreement to sell to him
their interests in said Three R group of claims at a grossly
inadequate price.''

The plaintiffs then allege:

''The concealment by Richardson . . . of the results of the
work done under Gray's direction, and the discovery, disclo-
sure and demonstration of a continuous ore body by Henry
J. Gray, and the consequent great enhancement in value and
marketability of the Three R group (and by trial amend-
ment) . . . and of the said work done by and under Bolinger
and its results, importance and significance, his harassing
and embarrassing Ben Heney financially, his discouraging let-
ters to Ben Heney, his false representations to the plaintiffs
in regard to the property, and his deceitful promises to
Francis J. Heney were, and each thereof was, part of a fraud-
ulent plan and scheme conceived and formed by Richardson
at or about the time Gray informed him that he could locate
and demonstrate an ore body in the Three R group, to con-
ceal from the plaintiffs and each of them the true condition,
value and marketability of the group, and to discourage them
. . . in respect to the property, and to take advantage of and
play upon Ben Heney's financial embarrassment and distress,
and so acquire the interest of Ben Heney and of Francis J.
Heney in said group of claims for a nominal and grossly in-
adequate consideration. Said concealment by Richardson
was . . . in bad faith, and was in violation of the trust and
confidence reposed in him by Ben Heney, and of his duty to
make full disclosure of facts, and was for the purpose and
with the intent to defraud the plaintiffs.''

The facts that placed upon Richardson the alleged duty to
make full disclosure are alleged to have been as follows:

''It was understood and agreed between Richardson and
Ben Heney, to wit, about or in the latter part of the month
of July, 1905, that they [Richardson and Ben Heney] would

as a joint and common venture, undertaking and business, prospect, explore, develop, work, mine, offer for sale and sell said entire group of claims, together with any other additional claims which they or either of them might locate or cause to be located adjacent or contiguous to any of such thirteen claims, and that they would not engage in the business of working said claims or any of them primarily for profit, but would work and develop them primarily for sale only; and that they would divide any further profits and losses of such joint and common venture in the proportion of two-thirds to and by Richardson and one-third thereof to and by Ben Heney, and this entire agreement continued in existence without modification or interruption until the present time unless ended about September, 1911, by the delivery to Richardson of the deed from Francis J. Heney as hereinafter alleged.''

The said complaint admits that the only interest Francis J. Heney at any time owned in the mines was that of an equitable lien on Ben Heney's interest evidenced by a deed of conveyance absolute in form from Ben Heney to Francis J. Heney, given merely to secure an indebtedness owing to the grantee by the grantor, of which Richardson is alleged to have had full knowledge.

The defendants demurred, assigning numerous grounds of objection to the said complaint, moved to strike many allegations appearing therein, and moved to require the said complaint to be made more definite and certain. The court overruled all of the demurrers, and denied all of the motions. These rulings on the demurrers and motions are assigned as error, but owing to the view I take of the whole case, a detailed notice of the questions raised is of little or no importance.

The facts stated in the said complaint, fairly considered and briefly stated, set forth that Richardson sustained toward Ben Heney relations of trust and confidence, arising first from their special contract of joint and common venture; and, second, arising from their tenancy in common in the mines, and because Richardson was the resident co-owner having in his charge the actual care and management of the property during the said tenancy, consequently he had imposed upon him by said confidential relations toward Ben Heney a special and peculiar obligation to deal with his co-owner with a can-

dor, a fairness and a refusal to avail himself of any advantage of superior information or other favorable circumstance, not required in the usual business transactions of life; that the work done under Henry J. Gray's supervision in October, November and December, 1909, resulted in disclosing the existence of material facts, that is, valuable ore bodies theretofore unknown, and these material facts were known to Richardson and by him concealed from Ben Heney; that Richardson availed himself of the advantage of this superior knowledge and favorable circumstance, which his duty to Ben Heney required him to disclose, and availing himself of this superior information purchased the interest of his co-owner, Ben Heney, for a grossly inadequate consideration.

If these material facts are established by the evidence, the duty of the court is to rescind the entire transaction as fraudulent, and restore to Ben Heney all rights he lost by means of the fraud practiced by Richardson in the transaction. Hence a cause for relief is sufficiently stated.

The answer to the merits admits that the alleged work, done under Gray's direction, was caused to be done by Richardson and at his sole expense, but denies that such work resulted in disclosing material facts theretofore unknown as alleged, other or different from that which had been disclosed by previous workings of the property. They admit that Richardson did not inform Ben Heney of the fact that the work was actually done under Gray's supervision, nor under Bolinger's direction, but allege that such work resulted in no benefit to the property. They allege that the first ore of commercial value discovered in the mines was discovered at points other than in the ground where Gray worked, and was discovered in April or May, 1911. They deny that the work done by Gray and Bolinger prior to November 6, 1910, added anything of value to the mines, and deny the alleged fraud and bad faith of Richardson, thereby setting forth a complete defense to the cause of action.

The issues of fact thus joined, briefly, are: The alleged title of Heney to the mines, except a three-sixteenth interest in the original four locations he purchased from Ed Anderson; the alleged joint and common venture contract of July, 1905; the materiality of the results of the work done under Gray's

XVIII Ariz.—13

supervision in October, November and December, 1909; the material facts alleged to have been concealed from Ben Heney, and the good faith of Richardson.

At the close of the evidence the parties requested and the court approved and submitted more than 200 interrogatories to the jury for their answers as a special verdict. These interrogatories were each separately answered by the jury in the affirmative, "Yes." Upon the return of the special verdicts, the court concluded that the special verdicts were in favor of the plaintiffs, "upon each and every of said interrogatories so submitted to them and upon each and every controverted question of fact raised by the pleadings in the case," rendered its judgment overruling the entire transaction of November 6, 1910, between Ben Heney and Richardson, and set aside and canceled the same; canceled the deed of April 5, 1911, and granted other relief.

Defendants moved for a new trial. The record as presented by the abstract does not disclose any affirmative action taken by the trial court on the motion. The judgment was rendered June 29, 1914, and entered July 9, 1914. This appeal is from the judgment.

The appellants contend on their assignment of error that the evidence does not justify the verdict or judgment. The vital issue of fact in the complaint, denied by the answer, and bitterly contested on the trial, was whether the development work done in the Colossus location under Henry J. Gray's supervision resulted in disclosing, opening up, proving and demonstrating "the existence, position, magnitude and trend of a very large and valuable body of ore, the existence, position, trend and magnitude of which had theretofore been . . . unknown."

The defendants assert that the Gray work resulted in no benefit to the mines, and was a complete loss to Richardson in expense, and a complete failure in its purpose. They concede that Richardson did not inform plaintiffs of the facts that the said work was actually done, nor of the extent of the work, nor of the place the work was done, nor of the expense incurred.

Conceding for the purposes of this case that the relations existing between Richardson and Ben Heney, arising from either of said relations, was of such a special and confidential

nature as to impose a duty upon Richardson to deal with Ben Heney with a candor, a fairness, and a refusal to avail himself of any advantage of superior information or other favorable circumstance, not required in the usual business transactions of life, as alleged in the said complaint, yet the question presented is: Were the facts concealed by Richardson material facts? The rule well settled is, as stated by 3 Pomeroy on Equity Jurisprudence, third edition, section 901, page 1609, viz.:

"If either party to a transaction conceals some fact which is material, which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud."

*Brooks* v. *Martin,* 69 U. S. (2 Wall.) 70, 17 L. Ed. 732, states the rule applicable to partners dealing *inter se.* Under this unquestioned rule, the concealment of facts not material, in other words, a mere failure to inform the other person to the relation of immaterial matters, is not a failure of duty and consequently is not fraud at all, within any known rule of law or equity. The complaint sufficiently charges a fraudulent concealment of material facts, and this action hinges upon the evidence to sustain that charge. The appellants contend that the evidence does not justify the verdict, nor the judgment, and to determine the question requires an examination of the evidence.

The work done under Gray's direction was commenced at a point in the Greene winze about twenty-two feet below the collar of said winze, and where the ore indications passed out of the side of the winze. This point was easily located from the ore body passed through by sinking the winze. Gray directed no work to be done at any other place in the mine workings. Extensive development work had been done, and a low-grade ore body had been extensively developed by such work. Gray directed the work so that the work done followed the ore indications from the Greene winze on an incline for a distance of from eight to ten feet, from the winze in a westerly downward direction. When Richardson made a personal inspection of the work done and being done, he ordered the work stopped. The work was stopped about the 5th of December, 1909.

Ben Heney testifies to facts known to him, which conclusively show that he was familiar with the true physical

conditions at the mines as disclosed by the work done, and otherwise, prior to the time Gray started his work on October 21, 1909. He testified that before he knew that the Gray work had been done, he considered his interest in the property worth anywhere from $25,000 up. On November 1, 1910, Ben Heney offered to sell his interest in the mines to Richardson, which offer Richardson unconditionally accepted.

Ben Heney knew, or was charged with knowing, that the ore values in the Three R group of mines, as disclosed by surface indications and by the work done thereon prior to October 21, 1909, were disseminated through the masses of vein rock and lay in small pockets or kidneys in such rock; that fractures cut through the mass and along such fractures showed iron was present in greater or less quantities; that these conditions occurred from the surface and in the workings known as the Greene winze; that the pockets or kidneys were small in size but rich in mineral value, and that as developed the mineralized rock was not of sufficient quantity nor of sufficient mineral richness to justify, in the opinion of mining men, the working of the body of rock as a paying ore body, or as a mine. He knew that mining experts differed in their opinions as to the significance of the fractures appearing in the workings, and as to other known conditions existing, but he knew that the expert mining men with whom he had dealings, and who had made examinations of the property and whose reports thereon he had seen, and these were many and of recognized ability in their calling, agreed that the ore bodies then developed were not of commercial value alone, but that the development and known fractures indicated a mine, and for that reason the mines had a speculative value. He is chargeable with knowing that the ore bodies so developed would indicate to any practical miner that they did not lay flat in the ground, but had a trend downward in the course of their strike. All of the expert witnesses introduced by the plaintiffs, including Henry Gray, agreed that the extent of the work done by Gray tended to indicate that the known ore bodies continued downward, and disprove that they lay flat, or bottomed at the twenty-two foot level of the Greene winze. No witness testified that the Gray work disclosed any new body of ore, or any new or unknown indications of ore bodies. The full extent to which any

evidence goes in this direction is that the work done under the direction of Henry Gray in October, November and December, 1909, proved that the known ore bodies continued on a downward trend for a distance of at least ten feet farther than was shown in the Greene winze, and that all known ore indications also continued said distance. Absolutely no new or different conditions were disclosed by the work from the conditions already known to exist.

Such was also the result of the Bolinger work commenced on October 23, 1910, and as continued up to November 6, 1910. Bolinger caused work to be commenced in October, 1910, in the Gray incline and worked on a line from his starting point a distance of about seven or eight feet, and this work disclosed no new conditions. It cut one fracture, but disclosed nothing theretofore unknown, because the fracture so cut was known to exist from prior workings and from the surface before Gray commenced to do any work. Besides, the plaintiffs do not contend that the Bolinger work disclosed any new conditions. They are foreclosed from such contention by the allegations in the trial amendment to their complaint, made to meet the evidence in the case, viz.:

"Said work prior to November 6, 1910, further opened up and disclosed and further demonstrated the existence, location, trend and magnitude of the same continuous body of commercial ore on said Colossus claim which was theretofore so disclosed, opened up, proved and demonstrated by Henry J. Gray so as aforesaid."

The evidence of plaintiffs is conclusive that the ore bodies which Gray worked upon were the known ore bodies which had been theretofore developed by the Greene winze in 1907. This ore body had been sampled and tested a number of times within Ben Heney's knowledge, and the experts seem to have agreed in the opinion that both Greene, in his work, and the Lewishons, in their work, had made grave errors by not following the ore body as Gray commenced to follow it. They agree, including Gray, that the fact was evident to any practical miner that the known ore body left the Greene winze at the point Gray commenced his work. So, plaintiffs by their amended pleading are bound thereby to the fact that the work of both Gray and Bolinger, up to

November 6, 1910, was done on a well-known ore body. From the evidence, the fact conclusively appears that neither disclosed new or different conditions from those already well known to the owners.

The Bolinger work is alleged by plaintiffs, and shown by the evidence, to have been done on the same ore bodies Gray worked upon, and the evidence is that the ore bodies which Gray worked upon were disclosed years before by Greene in sinking what is known as the "Greene Winze."

The evidence wholly fails to sustain the allegations of the complaint, in the particular that it fails wholly to establish that "in the course of said work Gray disclosed, opened up, proved and demonstrated the existence, position, magnitude and trend of a very large and valuable body of ore, the existence, position, trend and magnitude of which had theretofore been misapprehended, and unknown"; but, on the other hand, the evidence is convincing and tends to prove only that the body of ore on which Gray worked was well known to Ben Heney and had been known and had been tested for mineral for at least three years, and such ore body was not of sufficient magnitude or value to warrant its working as a commercial ore body.

The only fact demonstrated by the Gray work and by the Bolinger work, in continuation of the Gray work, was that the same ore body of substantially the same value continued for about eighteen feet farther than it was shown in the Greene winze, before Gray began work. The experts agreed again in their opinions, that the ore thus opened up, by Gray's work, and by Bolinger's work up to November 6, 1910, when taken alone, did not add to the known ore body a commercial value. They add that such work did add a speculative value to the mines. We are not concerned with speculative valuations, for the very evident reason that the courts have never held that speculative values are material facts the concealment of which, by a party having a duty to disclose them, amounts to an actual fraud, because speculative value is essentially based upon opinion, and not fact.

Conditions which give to a mine only speculative value are conditions that make it a favorable prospect of the location. All of the parties and witnesses agree that the Three R group of claims presented, from the surface and in all the work-

ings, favorable conditions for a mine—a favorable prospect. These conditions were not changed by the Gray work done in 1909, nor by the Bolinger work done up to November 6, 1910, as appears from all of the evidence.

Richardson concealed from Ben Heney no material fact nor conditions, and hence the contention of the appellant that the verdict is not justified by the evidence must be sustained as correct. The court was under the duty, from all the evidence, to direct the jury to find that Richardson did not conceal from Ben Heney any material fact which, if known, would have influenced Ben Heney's judgment in fixing the price for the sale of his interest in the said mines, and to render a decree for the defendants accordingly.

Under the evidence in the case, the plaintiffs have shown no right in law or in equity to the relief prayed. The ore that gave value to the property, as a mine, was discovered by the defendants in March, April or May, or perhaps on August 31, 1911, but at least a long time after the agreement between Richardson and Ben Heney was reached on November 6, 1910, and the discovery was made at points distant from where the Gray work was done, and at a great expense to Richardson.

The record discloses some circumstances which may be considered as of a suspicious nature, tending to indicate that Richardson had formed the design to acquire Ben Heney's interest in the mines at about the fourteenth day of October, 1910, when he wrote the letter of that date. All fair suspicion of this nature disappears from the evidence with Ben Heney's letter of date of October 21, 1910, whereby he informs Richardson of his (Ben Heney's) efforts to sell all of his interests in the mines to the first taker for a consideration of the assessment work on thirteen claims and the sum of $5,000, to be paid him within a year's time, at the option of the buyer, and other evidence is abundant in the record establishing that in February, 1909, Ben Heney and Richardson had serious differences in their dealings. Letters passed between them of accusations of wrongful dealings. Ben Heney had made repeated offers to sell to Richardson his interest in the property, and at least one of these offers fixed the purchase price to Richardson as $5,000 payable as a credit on a payment then about due from Ben Heney to Richardson

on another transaction. Heney admits that he knew and regarded Richardson as a hard taskmaster, and that Richardson had unjustly claimed to have been beat out of $6,000 by Ben Heney, and he adds:

"But I allowed that to go, and kept up my social relations with him because I made allowances for various things I knew about him."

This and many other circumstances in evidence indicate that on October 14, 1910, the beginning of the sale transaction, Ben Heney and Richardson were not trusting each other to any extent in business dealings, and such dealings as then arose were carried on at arm's-length as between strangers. The transaction was eminently one of vendor offering to sell and vendee accepting the offer made, in every respect, as if the deal was between strangers. A strained relation had existed between the parties for months, during a part of which time no communications had passed between these parties. In these circumstances and many other like circumstances in evidence, an honest desire for peace would prompt persons in Richardson's and Ben Heney's situations to end all such relations of a business nature as maintained such situation.

Upon the whole case I can see no legal or equitable grounds to deprive Richardson of the fruits of a transaction which he was invited to enter into, and the every condition imposed of which he met. He carried the burden of development work for a considerable time without reward, but when the reward did come he was entitled to enjoy it to the full extent.

Under all of the facts appearing in this record, I am unable to discover anything justifying the relief demanded, or any relief from the transaction.

Consequently I am of the opinion that the judgment appealed from ought to be vacated, and the cause remanded to the lower court, with instructions to enter a decree dismissing the action with costs of both courts.

ROSS, C. J., and FRANKLIN, J., concur.

---

Generally, as to effect of purchaser's concealment or misrepresentation of facts affecting the sale of real property, see comprehensive note in 30 L. R. A. (N. S.) 749.