**DeWitt LANGFORD et ux., Appellants,**

v.

**W. L. PICKENS et al., Appellees.**

No. 10373.

Court of Civil Appeals of Texas.

Austin.

March 14, 1956.

Seymour Lieberman, Walter M. Hilliard, Houston, for appellants.

Prentice Wilson, Dallas, for appellee, W. L. Pickens.

James R. Lewis, Tyler, Jack W. Prescott, Camp & Camp, Cameron, Weeks & Hankerson, Tyler, for appellee H. H. Coffield.

HUGHES, Justice.

The physical aspects of this record are odd. The transcript contains 433 pages, the statement of facts 1,386 pages and an additional 111 pages on the new trial hearing, yet appellants' brief covering six points contains just 11 pages.

The parties to this appeal are DeWitt Langford and wife, Lillian Langford, appellants and W. L. Pickens and H. H. Coffield, appellees.

This case was before the San Antonio Court of Civil Appeals on a venue appeal in Pickens v. Langford, 270 S.W.2d 285, to which we refer for informative purposes.

We take the following statement of the nature of the case from appellants' brief:

"The Appellants had conveyed, transferred and assigned to the Appellees their entire businesses under a written instrument by which Appellees would operate the businesses, pay off certain indebtednesses and liabilities, and return the remaining back to the Appellants. During the time that the Appellees operated Appellants' businesses, Appellees were receiving certain cash receipts which were never accounted for to the Appellants, and thereafter advised Appellants that the businesses did not pay off all of their indebtednesses and liabilities, and as a result had Appellants convey considerable property, both real and personal, to the Appellees. At a later date, the Appellants became aware of the numerous cash transactions that had been made by Appellees and never accounted for by the Appellees to the Appellants, and thereupon brought suit on the grounds that had Appellees ac-

counted to the Appellants for all the cash receipts that they had received during their operation of the businesses, the Appellants would not have owed the Appellees any sums of money, and, therefore, the conveyances made by Appellants to Appellees should be set aside after an accounting is made by Appellees to the Appellants for the moneys so received."

Appellants present six points the first three of which we summarize:

(1) The error of the court in holding that appellees have exercised good faith in discharging the duties imposed upon them.

(2) The error of the court in holding that appellees had fully accounted.

(3) The error of the trial court in holding that neither appellee is indebted to appellants.

We copy the remaining points:

"Fourth Point: When a fiduciary relationship exists between two parties, and the trustee handled a part of the income in such a manner that an audit of the books and records of the trustee will not reflect 100% of the cash received, the burden of proof shifts to the trustee to either account for the specific amount that he received, and which he did not put through the regular books and records, or, if he is unable to do this, then the trustee should become liable for the full amount that could have been received.

"Fifth Point: Since a fiduciary relationship existed between the Appellants and Appellees, and the trustee, the Appellees, handled a part of the income in such a manner that the books and records of the Appellees did not reflect 100% of the cash received, the burden of proof shifted to the defendants to either account for the specific amount that they received, and which they did not put through the

regular books and records, or, if they were unable to do this, the court erred in not holding the defendants liable for the full amount that could have been received.

"Sixth Point: The trial court erred in not following the rule of equity that under the misappropriation of funds all the gain by the trustee, by a wrongful appropriation of the trust fund, shall go to the cestui que trust, and all the losses borne by the trustee himself."

All points are grouped for briefing.

We now quote all the evidentiary facts given by appellants in their brief:

"Appellees' Exhibit No. 5, appearing on 462 S.F., is an agreement that was made on the 17th day of October, 1945, wherein the plaintiff DeWitt Langford, operating under the trade name, Gregg Wholesale Drug and Liquor Company, turned over his entire business operation of the Gregg Wholesale Drug and Liquor Company, including all of the assets acquired by DeWitt Langford from Stewart & Williams Distributors, Inc., and to use the proceeds derived from said operation to pay costs and expenses and liquidation of liabilities, and on Page 466 of the Statement of Facts, the Appellees agreed that:

" 'Any balance remaining after the payment in full of the foregoing obligation shall be paid by Eastern to Langford.'

*  *  *  *  *

"We call to the court's attention that the charter of Eastern Drug Company, S.F., 486, discloses that the defendants, Pickens and Coffield, were the principal capital stock owners of Eastern Drug Company, which is the company referred to in the agreement between Langford and Eastern Drug Company, and, as stated in S.F., 492, this corporation was set up to market this whiskey. It is to be noted, S.F.

498, W. L. Pickens was President and H. H. Coffield was Vice President. These are the two defendants in the law suit. It is also to be noted, S.F. 499, that W. L. Pickens was President and H. H. Coffield was Vice President throughout the period of its corporate existence, and on S.F. 499, when Mr. Pickens was asked:

" 'Q. You and Mr. Coffield were virtually the sole owners?'

"His answer was, 'Yes, sir.' And when he was asked:

" 'Q. And Mr. Bostick may have had the qualifying share, I presume?'

"His answer was: 'Yes, sir.'

"The testimony further shows that Mr. Bostick had been in the employ of Mr. Pickens, one of the Appellees, at the time Eastern Drug Company was organized, and that he had been a part-time employee for two to four years, and was a full-time employee of Mr. Pickens for approximately twelve to fifteen years. We call this to the court's attention because since the contract set out in S.F. 462 was between the plaintiff and Eastern Drug Company.

"We also wish to point out to this court Appellees' Exhibit No. 10, S.F. 540, which also was a trust agreement between DeWitt Langford to Tom Cooke, which also provided S.F. 541, that as and when the said DeWitt Langford shall have fully paid the said W. L. Pickens and H. H. Coffield for all sums of money heretofore or hereafter advanced, expended, or in any way or manner disbursed for the benefit of the said DeWitt Langford, together with all reasonable expenses in-

curred in connection therewith * * the said Tom Cooke, Trustee, will deliver and convey unto the said DeWitt Langford such remaining portions of the property conveyed to him in trust, as he shall then possess.

"Now, let us look and see who Mr. Tom Cooke is. The evidence clearly showed, S.F. 841, that Tom Cooke had been connected with Mr. Pickens, one of the Appellees herein, in many business transactions, and had been a partner with him starting back as early as 1940, and had been associated with him in the oil business, and apparently is still associated with him in the oil business, and helped him handle the Culver estate, which was another trustee or administration; that he had been associated with Mr. Pickens in a number of things, and on S.F. 842 Tom Cooke recalls being named trustee over five liquor stores in Gregg County. On S.F. 843, Tom Cooke recalls those stores belonged to DeWitt Langford, Appellant herein, before he became trustee, except for one store, which was opened during the trusteeship.

"We call to the court's attention that appellant's testimony as shown on S.F. 968, indicates that there were 148,000 or 140,000 cases of whiskey bought from Stewart Distributors, and, in any event, after deducting 30,000 cases, which was deducted to pay an indebtedness at a bank, that left 110,000 cases of whiskey actually received, and S.F. 969 indicates that the books and records of Eastern Drug Company showed a disposition of only 49,000 cases;[1] and the Appellant further testified on S.F. 968 that a Mr. Carter told him at one time that the demand

1. This reference is to testimony of appellant Mr. Langford regarding an audit made by Mr. Irion as to which the trial court found:
"Langford made no demand or request for an audit for at least one year after he made the settlement on the agreed basis of $234,803.26. He did obtain an

audit of all the books and records demanded by him through his auditor, Mr. Irion of Dallas, Texas, which audit is attached to Langford's deposition offered in evidence by Plaintiffs. This audit shows that the account as agreed upon by the parties in their final settlement of July 1948, was fair, equitable, and cor-

for whiskey was so great that he was collecting considerable cash from customers above the O.P.A. price, and that the books do not reflect any cash they collected above the O.P.A. prices.

"Now, in order to substantiate Appellant's testimony let us see what Mr. Carter himself had to say about this point. Let us look at some of the testimony of Albert G. Carter, S.F. 686:

" 'Q. Do you know the defendant, Mr. W. L. Pickens? A. Yes, sir.

" 'Q. How long have you known Mr. Pickens? A. I knew Mr. Pickens a good many years. I wouldn't know exactly how long. I met him through Tom Cooke a good many years ago. .

" 'Q. Was that acquaintance developed a long time before the formation of Eastern Drug Company? A. I would say it was a few years prior to Eastern Drug.

" 'Q. And, your association with him has been rather close since then, has it not? A. Not necessarily closer than anyone I knew under similar circumstances.'

"S.F. 689 indicates that Tom Cooke became the General Manager of Eastern Drug Company. Starting on S.F. 694, Albert Carter states that he began selling over the ceiling price and received between $3.00 and $5.00 per case over, and that all of his overage was handled in cash; and that he carried it to W. L. Pickens in Dallas; and that he did not get a receipt for it; and that Mr. Pickens, in Dallas, knew that the cash represented overage for whiskey sold. He further testified on S.F. 694 that the other part of the purchase price went right on the books, like on the other whiskey, and S.F. 695 indicates that this money,

the regular money, was deposited in the banks at Longview, and some of the money went to the Republic National Bank in Dallas, but definitely not the overage. Albert Carter, on S.F. 696 and S.F. 697, was unable to give an estimate as to amount of liquor sold over ceiling. In other words, Albert Carter is unable to state the amount of cash that he collected, or the amount of cash that he brought to W. L. Pickens. Now, in addition to this overage on whiskey, on S.F. 699 testimony indicates that $1.00 per case over was received on some 30,000 cases of beer.

"For more cash transactions, we go over to S.F. 142, wherein H. H. Coffield testified that a Clay Dunn brought to his office between $800.00 and $1,000.00 one day, and when asked if that was in cash testified that it was, and that it was brought to his office in Rockdale, and that it was brought to him, S.F. 1943, as a deposit on some whiskey that he had bought; and on S.F. 144, Mr. Coffield again brings up the trust relationship when he was asked:

" 'What kind of company was Eastern Drug Company?'

"His answer was:

" 'It was more of a selling agent for the whiskey that was involved.'

"And on S.F. 147, Mr. Coffield testified that he took this money that he received from Clay Dunn to Mr. Pickens in Dallas.

"In conjunction with the testimony, we wish to call to this court's attention, S.F. 323, wherein Mr. Pickens was asked the following question:

" 'Q. Now, Mr. Pickens, when did you first give DeWitt Langford a complete financial statement and audit of

rect and was extremely favorably to Langford as Pickens and Coffield could have claimed at least $100,000 more than was claimed if they had not waived com-

missions due them under the written contracts and a substantial amount of interest on sums advanced to and procured for Langford and his liquor stores."

Eastern Drug Company? A. I don't know that we ever gave him a complete financial statement and audit.'"

We also quote from the last page of appellants' brief in which they indicate the character of relief they seek:

"Based on the above decisions and considering the fact as set out above, the court should take the average between the $3.00 and $5.00 that Albert Carter testified he received from the whiskey and turned over to the Appellee, Pickens, which would amount to an average of $4.00 per case, and multiply it by 111,000 cases, making a total unaccounted for in the amount of $444,000.00, or, in using Appellee's own figures of 69,000 cases, it would amount to $276,000.00. This sum of money would be in excess of any amounts of money that the Appellees claim that the Appellant owed to the Appellees, particularly with 6% interest added thereon, and would be sufficient to wipe out any so-called indebtedness that Appellees claim Appellant owed Appellee, and would therefore render all the conveyances that Appellant had given to Appellees without consideration; and Appellees should be required to either pay Appellant the above amounts, with interest, or offset them against their indebtedness and make the conveyances back to Appellant."

In their first amended original petition appellants alleged:

"Plaintiff alleges it to be the fact that these Defendants for each and every sale and disposition of Plaintiff's whiskey and merchandise, received far in excess of the price authorized by the Office of Price Administration, and had these Defendants accounted to Plaintiff, as they were in duty bound to do, in a sum equal to the sum authorized by the Office of Price Administration as aforesaid, this Plaintiff would have realized for himself and as a net profit to him the sum of at least $1,000,000.00."

"Plaintiff alleges and would show it to be a fact that these Defendants in each and every sale and each and every sale and each and every disposition of said merchandise, charged a price, as reflected by their books, which was below the figure authorized by the Office of Price Administration, and below the actual initial cost, but in addition thereto these Defendants charged an additional price for said merchandise, which is not reflected by their books, commonly known among such people as 'under-table money' or 'black market money', and such additional price is in nowise reflected or accounted for on the books of these Defendants, or each of them, or the books of said Eastern Drug Company."

Appellants prayed for actual damages in the sum of $4,000,000 and other relief.

The trial court made extensive findings of fact and conclusions of law.

Appellees have filed separate briefs in which they fully discuss every issue and question which they consider to be in the case even though not raised by appellants in their brief.

As the case is presented to us we do not feel it our duty to analyze this huge record and record our findings and conclusions nor to appraise the apparent validity of the numerous positions taken and arguments made by appellees in support of the trial court's judgment. Our reasons follow.

The sole basis for all the relief sought in this Court is an accounting for and recovery of the money allegedly received by appellee in the sale of whiskey and beer over the maximum prices (OPA) fixed by law. Such sales, at least to the extent of the overcharge, if made, would be illegal. Thomas v. Linder, Tex.Civ.App. Austin, 231 S.W.2d 891, writ ref.; Morgan Ice Co. v. Barfield, Tex.Civ.App. Beaumont, 190 S.W.2d 847.

The evidence shows that such sales, if made, were made with the knowledge and consent of appellant, Mr. Langford.

In Pioneer Mutual Compensation Co. v. Diaz, 142 Tex. 184, 177 S.W.2d 202, 203, the Court said: "The test of whether a demand connected with an illegal transaction may be enforced at law is whether or not a case may be established without reliance on the illegal transaction."

We quote from Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, 150:

"The general rule is that 'no accounting or recovery of profits can be had by one party to an illegal transaction against another.' Williston on Contracts (1938) Vol. 6, p. 5069, Sec. 1785. It has been thus stated: 'The rule supported by the weight of authority is that the courts will not aid in the division of the profits of an illegal transaction between associates, although there are cases which hold that, in the case of a completed transaction, one of the associates in possession of the proceeds cannot set up the illegality as against the claims of the others.' 17 C.J.S., Contracts, § 277, pp. 664–665.

"Among the cases holding that between partners there may be an accounting of profits or assets acquired from illegal transactions are Pfeuffer v. Maltby, 54 Tex. 454; De Leon v. Trevino, 49 Tex. 88, and Brooks v. Martin, 2 Wall. 70, 17 L.Ed. 732. The opinion in Wiggins v. Bisso, 92 Tex. 219, 47 S.W. 637, 639, discusses the peculiar facts of those cases and thus approves the principle that controlled the decision of them: 'There can be no doubt that where the parties have jointly, in the pursuit of an illegal purpose, acquired money, and invested that money in property which is in the possession of one of the joint owners, such possessor cannot resist the claim of the other on the ground of the illegality of the business in which the money was first acquired. It was not necessary for plaintiff to prove the partnership, because the cotton was bought for the firm not in the course of the unlawful business.' Recovery of his share of the profits was denied to the plaintiff in the Wiggins case, in which the partnership had been formed for the express and sole purpose of making and carrying out a contract between the partnership and another association, which in its terms was a distinct violation of the anti-trust law of the state. The suit was for a division of the profits from the unlawful contract which were in the possession of one of the partners and had not been invested in other property."

We do not rest our decision here, however. The trial court made the following finding:

"There is no testimony before the court of a partnership relation between Langford and the Defendants. There is no testimony that Defendants failed, refused, or neglected to account fully to Langford for all money and property of his coming into their hands. Langford's own audit, which Plaintiffs introduced, shows this conclusively. There is no evidence of fraud or bad faith on the part of the Defendants in any of these transactions, but, on the contrary, they more than complied with all their obligations to Langford. Pickens and Coffield acted in said transactions with fairness and the utmost integrity."

Appellants made no effort to refute this finding by recitation of evidence or by reference to the record whereby such evidence could be found. Appellees, on the other hand, assert that this finding has evidence to support it and copy and refer to evidence as substantiating their contention.

As presented and as above stated we do not consider it our duty to further delve into this record.

The judgment of the trial court is affirmed.

Affirmed.